# 12-4795-cv

# United States Court of Appeals

*for the*

## Second Circuit

───────────────

MATTHEW PRINCE,

*Plaintiff-Appellant*,

v.

COUNTY OF NASSAU, JANE/JOHN DOES # 1-5, JOHN FITZGERALD, Lieutenant, Nassau County Police Department, 1st Precinct, JOHN SOTO, JOHN HERMAN, ARNOLD ROTHENBERG, Sergeants, 1st Precinct, JOHN/JANE DOES # 6-20, Police Officers, SCOTT TUSA, Associate Fire Marshal, Nassau County Office of Fire Marshal, JOHN/JANE DOES # 21-25, Fire Marshal Supervisory and Training Personnel, JOHN/JANE DOES # 26-30, Associate Fire Marshals,

*Defendants-Appellees.*

───────────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFF-APPELLANT

FISHERBROYLES LLP
445 Park Avenue, 9th Floor
New York, New York 10022
(516) 640-4117

*Attorneys for Plaintiff-Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................... iii

STATEMENT OF JURISDICTION.................................................................1

ISSUES PRESENTED FOR REVIEW ON THE APPEAL .......................................1

PRELIMINARY STATEMENT OF THE CASE ......................................................2

    Overview of Defendants' Retaliation Against Prince................................................2

    Prince Takes Legal Action Against His Pursuers .....................................5

STATEMENT OF FACTS .......................................................................7

    The Parties ...................................................................................7

    Nassau County Police and Fire Marshals' Presence at Bogart's Prior to October 2002........................................................................8

    The October 2002 Incident and IAU Complaint ...................................10

    Prince's Grand Jury Testimony and the Ensuing Police Harassment .....................11

    Bogart's Change in Ownership.......................................................15

    The March 2005 Meeting with Law Enforcement ..................................18

    A-Leet Is Forced to Surrender Its Liquor License...................................19

    Prince Is Retained as a Consultant for Chrebet's ....................................23

    Defendants Force Chrebet's To Terminate Prince ...................................25

        1. Chrebet's Opens to a Raid...........................................................25

        2. Prince's Arrest on the Night of June 21-22, 2007.........................................29

        3. The June 27, 2007, Meetings with Chrebet, Jr. ...............................34

        4. The Meeting with County Executive Suozzi and Prince's Termination........43

    Defendants Effectively Bar Prince from Working Again in the Hospitality Field ..46

        1. The Raids of November 9 and 10, 2007.......................................46

i

2. Additional Police and Fire Marshal Activity in Early 2008 ..........................50

3. The Police Instruct Chrebet, Sr., to Ban Prince from Chrebet's ...................54

4. Chris Greene's Fear of Similar Retaliation Precluded at Trial .....................60

Prince is Severely Injured by Defendants' Conduct................................................60

Hurricane Sandy and the Unexpected Length of the Trial Raise Jury Concerns .....63

Jury Deadlock on the Intentional Infliction of Emotional Distress .........................65

SUMMARY OF ARGUMENT ...................................................................................67

ARGUMENT ...........................................................................................................70

POINT I   THE DISTRICT COURT ERRED IN DISMISSING PRINCE'S 42 U.S.C.
§ 1983 MUNICIPAL LIABILITY CLAIMS AGAINST NASSAU COUNTY .........70

A. There Are Numerous Grounds for § 1983 Municipal Liability............................70

B. The District Court Erroneously Foreclosed Several Theories of Liability That Do
Not Depend on Acts by Policymakers .......................................................................76

C. The District Court Should Have Allowed the Jury to Consider the Role of
Municipal Policymakers ............................................................................................89

POINT II   THE DISTRICT COURT ERRED IN DISMISSING PRINCE'S FIRST
AMENDMENT RETALIATION CLAIM ...................................................................94

POINT III   THE DISTRICT COURT'S RESPONSE TO JURY QUESTIONS
REGARDING THE INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
WAS INADEQUATE AND FAILED TO CURE CONFUSION OF A
DEADLOCKED JURY ..............................................................................................98

POINT IV   THE DISTRICT COURT FAILED TO TAKE NECESSARY
REMEDIAL ACTION IN THE FACE OF HURRICANE SANDY AND DELAYS
PRIOR TO AND DURING JURY DELIBERATIONS ...........................................105

POINT V   CHRIS GREENE WAS IMPROPERLY PRECLUDED FROM
OFFERING TESTIMONY AS TO HIS FEAR OF RETALIATION BY
DEFENDANTS ......................................................................................................112

CONCLUSION .......................................................................................................114

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Adams v. State,*
   765 S.W.2d 479 (Tex. Ct. App. 1988, *pet. ref'd*) .................................. 108, 109

*Adickes v. S.H. Kress & Co.,*
   398 U.S. 144 (1970) ......................................................................................71

*Amnesty America v. Town of West Hartford,*
   361 F.3d 113 (2d Cir. 2004) ........................................... 71, 75, 87, 89

*Anderson v. City of New York,*
   817 F. Supp. 2d 77 (E.D.N.Y. 2011) ..................................................98

*Anilao v. Spota,*
   774 F. Supp. 2d 457 (E.D.N.Y. 2011) .............................................72

*Arizona v. Fulminante,*
   499 U.S. 279 (1991) ...................................................................................108

*Baron v. Suffolk County Sheriff's Dep't,*
   402 F.2d 225 (1st Cir. 2005) ....................................................................71, 73

*Barry v. New York City Police Dep't,*
   No. 01 Civ.10627 (CBM), 2004 U.S. Dist. LEXIS 5951
   (S.D.N.Y. Apr. 7, 2004) ..........................................................................88

*Bartels v. Inc. Vill. of Lloyd,*
   751 F. Supp. 2d 387 (E.D.N.Y. 2010) ..............................................96

*Bertuglia v. City of New York,*
   839 F. Supp.2d 703 (S.D.N.Y. 2012) .......................................... 74-75

*Birmingham v. Ogden,*
   70 F. Supp. 2d 353 (S.D.N.Y. 1999) ................................................86

*Bissinger v. City of New York,*
   No. 06 Civ. 2325 (WHP), 2007 U.S. Dist. LEXIS 70155
   (S.D.N.Y. Sept. 24, 2007) ....................................................................75, 87

*Blair v. Pomona,*
   223 F.3d 1074 (9th Cir. 2000) ........................................... 74, 87, 89

iii

*Bollenbach v. United States*,
326 U.S. 607 (1946).........................................................................100, 102, 103

*Bordanaro v. McLeod*,
871 F.2d 1151 (1st Cir.), *cert. denied*, 493 U.S. 820 (1989)............................78

*Brown v. City of Margate*,
842 F. Supp. 515 (S.D. Fla. 1993), *aff'd*, 56 F.3d 1390
(11th Cir. 1995) ...........................................................................................75

*Butler v. City of Glens Falls*,
No. 1:10-CV-679 (NAM/RFT), 2012 U.S. Dist. LEXIS 6826
(N.D.N.Y. Jan. 20, 2012)...............................................................................96

*Cameron v. City of New York*,
598 F.3d 50 (2d Cir. 2010) ..................................................................112, 113

*Canton v. Harris*,
489 U.S. 378 (1989).................................................................................72, 73

*Carter v. United States*,
252 F.2d 608 (D.C. Cir. 1957)......................................................................106

*City of St. Louis v. Praprotnik*,
485 U.S. 112 (1988).......................................................................................71

*Collins v. City of New York*,
No. 11-CV-766 (FB)(RML), 2013 U.S. Dist. LEXIS 21199
(E.D.N.Y. Feb. 15, 2013) ..........................................................................77-78

*Connick v. Thompson*,
__U.S.__, 131 S. Ct. 1350 (2011) ................................................................71

*Coppedge v. United States*, 272 F.2d 504 (D.C. Cir. 1959), *cert. denied*, 368
U.S. 855 (1961).............................................................................................110

*Crippen v. Town of Hempstead*,
No. 07-CV-3478 (JFB), 2009 U.S. Dist. LEXIS 24820
(E.D.N.Y. Mar. 25, 2009)........................................................................75, 87

*Curley v. Village of Suffern*,
268 F.3d 65 (2d Cir. 2001) ............................................................................94

*Daskalea v. District of Columbia*,
227 F.3d 433 (D.C. Cir. 2000)........................................................................74

iv

*Davis v. Lynbrook*,
224 F. Supp. 2d 463 (E.D.N.Y. 2002) ................................................76

*DeLima v. Trinidad Corp.*,
302 F.2d 585 (2d Cir. 1962) ..............................................................99

*Doe v. Gay*,
719 F.3d 679 (8th Cir. 2013) ............................................................73

*Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*,
282 F.3d 83 (2d Cir. 2002) ...............................................................95

*Downum v. United States*,
372 U.S. 734 (1963).........................................................................102

*Duchesne v. Sugarman*,
566 F.2d 817 (2d Cir. 1977) .............................................................91

*Estes v. Texas*,
381 U.S. 532 (1965).........................................................................108

*Freihofer v. Hertz Corp.*,
65 N.Y.2d 135 (1985)............................................................. 65, 102

*Gagliardi v. Village of Pawling*,
18 F.3d 188 (2d Cir.1994) ................................................................95

*Ganapolsky v. Park Gardens Development Corp.*,
439 F.2d 844 (1st Cir. 1971)................................................ 110, 111

*Gautreaux v. Scurlock Marine, Inc.*,
107 F.3d 331 (5th Cir. 1997) ...........................................................99

*Gentile v. County of Suffolk*,
926 F.2d 142 (2d Cir. 1991) .............................................................74

*Gill v. Manuel*,
388 F.2d 799 (9th Cir. 1973) ...........................................................99

*Gill v. Pidlypchak*,
389 F.3d 379 (2d Cir. 2004) ........................................ 68, 94-95, 96

*Grandstaff v. City of Borger*,
767 F.2d 161, 170 (5th Cir. 1985), *cert. denied*,
480 U.S. 916 (1987)...........................................................................78

*Hasan v. Holder*,
No. 11-3381, 2013 U.S. App. LEXIS 8841 (2d Cir. May 1, 2013) .................70

*Hayes v. State*,
292 P.2d 442 (Okl. Cr. App. 1956) ...............................................................109

*Henry v. County of Shasta*,
132 F.3d 512 (9th Cir. 1997), *amended on denial of reh'g*,
137 F.3d 1372 (9th Cir 1998) ..........................................................................78

*Hudson v. New York City*,
271 F.3d 62 (2d Cir. 2001) ..............................................................................99

*Hughes v. State*,
437 A.2d 559 (Del. 1981) ...............................................................................106

*Jackson v. Marion County*,
66 F.3d 151 (7th Cir. 1995) ..............................................................................76

*Jeffes v. Barnes*,
208 F.3d 49 (2d Cir. 2000) ...............................................................................74

*Johns v. Jarrard*,
927 F.3d 551, (11th Cir.), *reh'g denied*, 935 F.2d 1297
(11th Cir. 1991) ..............................................................................................101

*Kempkes v. Downey*,
No. 07-CV-1298 (KMK)(GAY), 2008 U.S. Dist. LEXIS 25981,
(S.D.N.Y. Mar. 31, 2008) ................................................................................87

*Kneipp v. Tedder*,
95 F.3d 1199 (3d Cir. 1996) .......................................................................74, 89

*Krulewich v. United States*,
336 U.S. 440 (1949)........................................................................................110

*Kuck v. Danaher*,
600 F.3d 159 (2d Cir. 2010) ......................................................................94, 95

*Laird v. Tatum*,
408 U.S. 1 (1972).............................................................................................95

*McLaurin v. New Rochelle Police Officers*,
373 F. Supp. 2d 385 (S.D.N.Y. 2005), *aff'd in part, vacated on other
grounds*, 2007 U.S. App. LEXIS 1839 (2d Cir. Jan. 25, 2007) ......................86

*Milam v. City of San Antonio*,
  113 Fed. Appx. 622 (5th Cir. 2004) ...............................................................73

*Monell v. New York City Dept. of Social Services,*
  436 U.S. 658 (1978) ..................................................................... *passim*

*Morrison v. Johnson,*
  429 F.3d 48 (2d Cir. 2005) ...............................................................96

*Nader v. General Motors Corp.,*
  25 N.Y.2d 560 (1970) ...............................................................66

*National Railroad Passenger Corp. v.*
  *One 25,900 Square Foot More or Less Parcel of Land,*
  766 F.2d 685 (2d Cir. 1985) ...............................................................99

*Norwood v. Vance,*
  572 F.3d 626 (9th Cir. 2009), *opinion amended on other grounds on*
  *denial of reh'g*, 591 F.3d 1062 (9th Cir. 2010) ...............................................104

*Nudd v. Burrows,*
  91 U.S. (1 Otto) 426 (1875) ...............................................................111

*Okin v. Village of Cornwall-on-Hudson Police Dep't,*
  577 F.3d 415 (2d Cir. 2009) ............................................... 73, 87, 89

*Owens v. Haas,*
  601 F.2d 1242 (2d Cir.), *cert. denied sub nom. County of Nassau v. Owens*,
  444 U.S. 980 (1979) ...............................................................74, 87

*Panaderia La Diana, Inc. v. Salt Lake City Corp.,*
  342 F. Supp. 2d 1013 (D. Utah 2004) ...............................................................90

*Pembaur v. City of Cincinnati,*
  475 U.S. 469 (1986) ............................................... 71, 85, 87

*People v. Aponte,*
  2 N.Y.3d 304 (2004) ...............................................................104

*People v. Santamaria,*
  229 Cal.App.3d 269 (Cal. Ct. App. 1991) ...............................................108

*Phat's Bar and Grill, LLC v. Louisville,*
  No. 3:10-CV-00491-JGH, 2013 U.S. Dist. LEXIS 9422,
  (W.D. Ky. Jan. 24, 2013) ...............................................................88

vii

*Potthast v. Metro-North-North Railroad Co.*,
  400 F.3d 143 (2d Cir. 2005) ................................................................. 106, 110

*Powe v. City of Chicago*,
  664 F.2d 639 (7th Cir. 1981) .......................................................74, 87

*Price v. Glosson Motor Lines, Inc.*,
  509 F.2d 1033 (4th Cir. 1975) ........................................................ 100-101

*Puckett v. City of Glen Cove*,
  631 F. Supp. 2d 226 (E.D.N.Y. 2009) .........................................96

*Redmond v. Baxley*,
  475 F. Supp. 1111 (E.D. Mich. 1979) .........................................75

*Roman Catholic Diocese v. Inc. Village of Old Westbury*,
  No. 09-CV-5195, 2012 U.S. Dist. LEXIS 56694
  (E.D.N.Y. Apr. 23, 2012) ..............................................................96

*Rubens v. Mason*,
  527 F.3d 252 (2d Cir. 2008) .......................................................70, 94

*Sango v. City of New York*,
  No. 83 CV 5177 (JMM), 1989 U.S. Dist. LEXIS 18214
  (E.D.N.Y. June 19, 1989) ..............................................................75

*Shanks v. Village of Catskill Board of Trustees*,
  653 F. Supp.2d 158 (N.D.N.Y. 2009) ................................... 75, 87, 97

*Sharp v. City of Houston*,
  164 F.3d 923 (5th Cir. 1999) ........................................ 73, 74, 85, 87

*Sorlucco v. New York City Police Dep't*,
  971 F.2d 864 (2d Cir. 1992) ........................................ 72, 73, 74, 86

*Spell v. McDaniel*,
  824 F.2d 1380 (4th Cir. 1987) .......................................................74

*Tart v. McGann*,
  697 F.2d 75 (2d Cir. 1982) .........................................................100

*Termite Control Corp. v. Horowitz*,
  28 F.3d 1335 (2d Cir. 1994) .........................................................99

*Tomlins v. Village of Wappinger Falls Zoning Board of Appeals*,
  812 F. Supp. 2d 357 (S.D.N.Y. 2011) .............................................96

*Townsend v. Lumbermans Mutual Casualty Co.*,
  294 F.3d 1232 (10th Cir. 2002) .........................................................99

*Trevizo v. Adams*,
  2006 U.S. App. LEXIS 18691 (10th Cir. July 26, 2006) ..................................90

*Turpin v. Mailet*,
  619 F.2d 196 (2d Cir.)*, cert. denied, Turpin v. West Haven*,
  449 U.S. 1016 (1980) ......................................................... 72, 87, 88

*United States v. Castellanos*,
  478 F.2d 749 (2d Cir. 1973) ............................................................102

*United States v. Combs*,
  33 F.3d 667 (6th Cir. 1994) ..................................................... 100, 101

*United States v. Dove*,
  916 F.2d 41 (2d Cir. 1990) ....................................................... 99, 104

*United States v. Duran*,
  133 F.3d 1324 (10th Cir. 1998) .......................................................100

*United States v. Esso*,
  684 F.3d 347 (2d Cir. 2012) ..........................................................105

*United States v. Hay*,
  122 F.3d 1233 (9th Cir. 1997) ........................................................108

*United States v. Lefkowitz*,
  284 F.2d 310 (2d Cir. 1960) ..........................................................100

*United States v. Nunez*,
  889 F.2d 1564 (6th Cir. 1989) ........................................................101

*United States v. Rossomando*,
  144 F.3d 197 (2d Cir. 1998) ..........................................................100

*United States v. Smith*,
  44 F.3d 1259 (4th Cir. 1995), *cert. denied*, 514 U.S. 1113 (1995) .................109

*United States v. Stevens*,
  38 F.3d 167 (5th Cir. 1994) ..........................................................104

*United States v. Stratton*,
  779 F.2d 820 (2d Cir. 1985), *cert. denied*, 476 U.S. 1162 (1986) .................107

ix

*United States v. United States Gypsum Co.*,
  438 U.S. 422 (1978).........................................................................................104

*United States v. Yakobowicz*,
  427 F.3d 144 (2d Cir. 2005) ...........................................................................105

*United States v. Zabriskie*,
  413 F.3d 1139 (10th Cir. 2005) ............................................................. 103-104

*United States v. Zimmerman*,
  943 F.2d 1204 (10th Cir. 1991) ......................................................................104

*Vaher v. Town of Orangetown*,
  916 F. Supp. 2d 404 (S.D.N.Y. 2013) ........................................................96, 97

*Vann v. City of New York*,
  72 F.3d 1040 (2d Cir. 1995) ...........................................................................74

*Vasarhelyi v. New School for Social Research*,
  230 A.D.2d 658 (1st Dep't 1996)....................................................................66

*Walker v. City of New York*,
  974 F.2d 293 (2d Cir. 1992) ...........................................................................74

*Walsh v. Miehle-Goss-Dexter, Inc.*,
  378 F.2d 409 (3d Cir. 1967) ............................................................... 101, 104

*Williams v. Town of Greenburgh*,
  535 F.3d 71 (2d Cir. 2008) ...........................................................................94

*Woodward v. Correctional Medical Services*,
  368 F.3d 917 (7th Cir. 2004) .................................................................... 73-74

*Zarega Avenue Realty Corp. v. Fred Todino & Sons, Inc.*,
  571 F.3d 206 (2d Cir. 2009) .........................................................................112

## Statutes & Other Authorities:

28 U.S.C. § 1291 ...................................................................................................1

28 U.S.C. § 1331 ...................................................................................................1

28 U.S.C. § 1343(a)(3)..........................................................................................1

28 U.S.C. § 1343(a)(4)..........................................................................................1

28 U.S.C. § 1367 ...................................................................................................1

42 U.S.C. § 1983 ................................................................................. *passim*

42 U.S.C. § 1988 ........................................................................................ 1

Fed. R. Evid. 201 ................................................................................. 106

Fed. R. Evid. 403 ................................................................................. 112

Fed. R. Evid. 606(b) ............................................................................ 109

"After Sandy: Storm Sets New Marks," *Newsday*, Dec. 7, 2012 ............. 106

Dennis Coon and John O. Mitterer, *Introduction to Psychology* 315
    (11th ed. 2007) ............................................................................ 107

Dodge Fernald, *Psychology: Six Perspectives* 240 (2008) ....................... 107

Richard C. Atkinson and Ernest R. Hilgard, *Introduction to Psychology* 288
    (15th ed. 2009) ............................................................................ 107

Richard Cummings, *The Pied Piper: Allard K. Lowenstein and the Liberal
    Dream* 383 (1985) ............................................................................ 91

Prosser & Keeton, Torts § 12 (5th ed.) ....................................................... 66

1 M. Schwartz & J. Kirklin, *Section 1983 Litigation,* § 7.8 (2d ed. 1991) ................ 73

## STATEMENT OF JURISDICTION

The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and (4) over Plaintiff's claims under 42 U.S.C. §§ 1983 and 1988 alleging violations of federal constitutional rights, and over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

The district court entered final judgment for Defendants on November 20, 2012. Plaintiff filed his Notice of Appeal on November 30, 2012. (A5183.) Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1291. (SPA1-SPA2.)

## ISSUES PRESENTED FOR REVIEW ON THE APPEAL

1.  Did the district court err when, on summary judgment, it limited Plaintiff's § 1983 municipal liability claims against Nassau County, and later dismissed such claims at trial on Defendants' Rule 50 motion?

2.  Did the district court err when, on summary judgment, it dismissed Plaintiff's First Amendment retaliation claim?

3.  Given the jury deadlock, did the district court err when it failed to answer jury questions seeking clarification of intentional infliction of emotional distress and instead only restated the general standard?

4.     During an unprecedented eighteen days of delay prior to and during jury deliberations caused by Hurricane Sandy, did the district court, confronted with seventeen jury requests for read backs and other indications of jury confusion, fail to take necessary remedial action to ensure a fair trial, such as assessing the jury's capacity to carry out its duties, summarizing the evidence, or ordering a new trial?

5.     Did the district court err in precluding testimony from Plaintiff's coworker, a manager named Chris Greene, about Greene's fear of retaliation by Defendants, the central issue in this case?

## PRELIMINARY STATEMENT OF THE CASE

### *Overview of Defendants' Retaliation Against Prince*

In 2002, Plaintiff-Appellant Matthew Prince[1] was a successful businessman in the restaurant and bar industry in Nassau County.  He had a promising future— happily married, living in a new home, and presented with many attractive business opportunities.  On October 6, 2002, the trajectory of his life changed after he witnessed three police officers brutally assault an 18-year-old named Peter Fama near a bar-restaurant called Bogart's, where Prince worked.  In January 2003, a state grand jury investigated Fama.  Despite his reluctance, Prince told the

---

[1] References to "Prince" are to Matthew Prince.  References to his father Allan, misspelled in the trial transcript as "Allen," shall be made by his full name, or as one of "Prince's parents."

grand jury what he witnessed. As a result, the grand jury refused to indict Fama.

Immediately thereafter, in breach of grand jury secrecy, Prince was confronted by a Nassau County police officer who told him, "I'm going to take you out of your F'ing life for what you said in there," referring to the grand jury room. (A2288.) What followed was a protracted campaign of harassment over several years at the hands of the Nassau County police, who expanded and intensified their threatening presence at Bogart's to intimidate Prince. Several officers told Prince he was receiving this special treatment because he testified against the police. Prince's parents had owned Bogart's for nine years. Six months after their son's grand jury testimony, Defendants' harassment was so intense, persistent, and severe they decided they had no choice but to sell the establishment.

The next owners of Bogart's hired Prince as a consultant, in light of his expertise in running a successful restaurant. This arrangement did not last even a year after law enforcement officials learned in 2005 of Prince's continued involvement with the establishment. Police and fire marshals resumed the harassment by raiding Bogart's and repeatedly asked for Prince when they arrived.

Notwithstanding this abuse at the hands of Defendants, Prince had the opportunity of a lifetime when former New York Jets wide receiver Wayne Chrebet, Jr., a friend from college days, partnered with Prince to oversee the creation of a new establishment known as Chrebet's Restaurant and Lounge

3

("Chrebet's").  The restaurant was built at the site once occupied by Bogart's.

Chrebet, Jr., planned to open several locations across the country.  This spawned

talks between Prince and other professional sports stars like New York Yankees

slugger Reggie Jackson and boxing champion Arturo Gatti about other restaurant

opportunities.  However, these prospects came to an abrupt end after Chrebet's

opened for business and Defendants engaged in a scheme to destroy it unless

Chrebet, Jr., severed all ties with Prince.

Chrebet's was raided at its June 2007 grand opening and a week later, with

police and fire marshals storming the establishment and asking for Prince on both

occasions.  On the second occasion, they found him, and a police sergeant arrested

Prince on an erroneously issued bench warrant.  The sergeant gleefully expressed it

was his "lucky day."  Desperate for the raids to end lest his new restaurant die at

birth, Chrebet, Jr., enlisted the former Nassau County Republican Party chairman

to reach out to relevant county officials, only to be told the key to ending the raids

would be to terminate Prince.  Chrebet, Jr., reluctantly did so to get Defendants off

his back.  This worked—at least for several months.

Starting in late 2007, police raids resumed with officers asking for Prince,

because they believed he was again involved with the restaurant even though he

had been terminated.  Chrebet's father and a manager visited the local police

precinct in March 2008 to plead for an end to the raids.  The police response was

4

that Prince must not be permitted to ever set foot on the premises again on pain of arrest, and Chrebet's should send him written notice to that effect. Chrebet, Sr., wrote the letter with great reluctance, noting that "due to the position of the authorities we have no alternative." (A4945.)

At that point, Defendants' blackballing of Prince from the hospitality industry was complete. Significantly, the police officers who drove Prince from Chrebet's in 2007-2008 were not the same officers who harassed him at Bogart's in 2003. Indeed, most of them arrived at the precinct only in 2006. They did not know Prince, yet they adopted the animus of their fellow officers. The persistent abuse was not confined to a few rogue officers. Instead, it constituted a practice and custom of Nassau County.

Prince lost his means of making the living to which he had dedicated his career—all at the direction of county law enforcement officials. The stress caused this once happily married father of three to lose his wife, children, and family house.

### Prince Takes Legal Action Against His Pursuers

On May 5, 2008, Prince filed a complaint in the Eastern District of New York against Defendants: Nassau County; several individual officials involved in the incidents of 2007-2008, police officers Brian Fitzgerald, Richard Soto, Richard Hermann, and Arnold Rothenberg; and fire marshal Scott Tusa. Prince alleged

First Amendment retaliation and violation of Due Process property and liberty rights secured by 42 U.S.C. § 1983 and corresponding claims under the New York State Constitution. He also alleged state law claims for tortious interference with business relations and intentional infliction of emotional distress. (A23-A65.)

Defendants moved for summary judgment on September 15, 2010. In a Memorandum and Order dated September 21, 2011,[2] the district court dismissed Prince's § 1983 First Amendment claims and dismissed his § 1983 Due Process claims as to Defendants Fitzgerald, Hermann, and Rothenberg in their individual capacities, along with claims based upon denial of a liberty interest. (A2155-A2164, A2170-A2172.) However, the Court denied Defendants' motion with respect to the Due Process claims based upon property interests as to Defendants Soto, Tusa, and Nassau County, and maintained Prince's state law claims for tortious interference with business relations and intentional infliction of emotional distress. (A2164-A2170, A2177-A2180.) Prince's state constitutional claims were dismissed. (A2180-A2181.)

Trial occurred in 2012 over the span of approximately eleven weeks on the surviving issues. Prior to charging the jury, the district court granted Defendants' Rule 50 motion and ruled that Nassau County could not be held liable under §

---

[2] Reported at 837 F. Supp.2d 71 (E.D.N.Y 2011).

1983, so the issue of municipal liability was never presented to the jury. (A4370-A4373, A4383-A4396.)

Jury deliberations on the few remaining issues began thirteen days after the close of evidence. The delay was caused by Hurricane Sandy. In addition, there was a further five-day separation during deliberations. On November 20, 2012, the jury returned a defense verdict on all claims, and the court entered judgment in Defendants' favor the same day. (A5111-A5118, SPA1-SPA2.) Prince filed his Notice of Appeal to this Court on November 30, 2012. (A5183.)

## STATEMENT OF FACTS

### *The Parties*

Prince is a businessman who was employed in the restaurant and bar industry in Nassau County from 1994 until July 2007, when Defendants drove him out of that business. Starting in 1994, Prince worked at a bar-restaurant owned by his parents through Prince News Corp. and located in Uniondale known initially as Bogart's. (A2277-A2279, 573 at A2513, 605-606 at A2521.) Defendant-Appellee Nassau County is a municipal corporation duly organized and existing under the laws of the State of New York. Defendant-Appellee Scott Tusa was employed by the Nassau County Fire Marshal's Office, where since January 2005 he served as the division supervisor of the general inspection division, which is responsible for

7

inspecting places of public assembly. (A3112, A3928.) Defendants-Appellees

Richard Soto (A3286-A3287), Arnold Rothenberg (A4183), and Richard Hermann

(1957 at A2868) were sergeants in the First Precinct beginning in January 2006.

Defendant-Appellee Brian Fitzgerald was a lieutenant in the First Precinct

beginning in December 2006. (2415 at A2985.)


***Nassau County Police and Fire Marshals' Presence at Bogart's Prior to October 2002***

Prince began working at Bogart's in Uniondale ("Bogart's"[3]) in 1994, when

his parents purchased the establishment. His duties consisted of deejaying,

bartending, training employees, and helping to promote Bogart's. (A2279, 623 at

A2525.) He never was an owner or manager of Bogart's while his parents owned

it. (A2279, A2328, 575 at A2513.) Others, including two retired Nassau County

police detectives, worked at various times as night managers and were responsible

for preventing underage drinking and addressing issues for police officers or fire

marshals. (309 at A2445, 594 at A2518, 628 at A2526.) As a condition of holding

a liquor license, Bogart's was subject to regular premise checks or inspections by

appropriate legal authorities, but such inspections were infrequent in the early days

of Bogart's ownership by Prince's parents. (631-632 at A2527.) When they

---

[3] All references to Bogart's are to the location in Uniondale as distinguished from the locations in Long Beach or New York City unless otherwise indicated.

8

occurred, the police would send two officers and one sergeant.  (A2298-A2299, 988-989 at A2617-A2618.)

Prince was absent from Bogart's for most of the five years prior to January 2003.  Between 1998 and November 2001, he worked most of the time at another establishment owned by his parents through a corporation, Bogart's on Park Avenue in Long Beach, which he had helped open and develop; Long Beach had its own police department, so Prince's work at that location involved no contacts with Nassau County police officers or fire marshals.  (A2299-A2300, 607 at A2521.)  The Long Beach operation was a success, and it sold for a substantial profit at the end of 2001.  (596-597 at A2518-A2519.)  Prince was married in December 2001 and moved to a house in Dix Hills.  (567 at A2511, 1473 at A2744.)

On various occasions prior to January of 2003, the Nassau County Police Department or Fire Marshal issued tickets or made arrests at Bogart's for serving alcohol to minors and overcrowding.  (A2280.)  Prince was not in charge of Bogart's on any of those occasions and thus "never really dealt with" police and fire marshals "that much," but when he "did deal with them, they were professional" in their conduct.  *Id.*  There were numerous times when Prince as a bartender would check patrons' identifications and have them removed from the bar.  (310-311 at A2445-A2446.)

9

***The October 2002 Incident and IAU Complaint***

On October 6, 2002, at approximately 2:20 a.m., as he was ending his shift, Prince was alerted by an employee of an altercation on a side street outside. (A2280-A2281.) From a distance of 20-25 feet, Prince witnessed an argument between three police officers and an 18-year-old named Peter Fama followed by the officers' brutal assault of Fama. (A2281-A2284.) Specifically, he saw the officers open the trunk of their police car, grab a white towel, wrap it around Fama's face, and he then saw two officers hold Fama as the other officer punched him before putting him in their car and driving away. (A2282-A2285, 362 at A2458.) Prince witnessed the incident starting when it was a shouting argument prior to the physical assault, though he was unaware of the reason for the argument. (364-365 at A2459.) Police Officer Michael Collins testified that the struggle occurred after Fama had tried to prevent the police from arresting his friend. (2717-2719 at A3062.) He admitted he wrapped the towel around Fama's mouth and nose, supposedly to prevent him from spitting (2723 at A3063, 2757 at A3072), and punched him "[o]nce or twice when he was spitting at" him and another arresting officer. (2753-2754 at A3071.) The Nassau County District Court informations charging Fama did not mention spitting. (2750 at A3070, A4946-A4949.) Also present as the head sergeant that night was Sergeant Ronald

10

Nesbitt.  (A2289.)

On approximately October 11, 2002, Prince's parents, through their attorney

Brian Griffin, filed an Internal Affairs Unit ("IAU") complaint with the Nassau

County District Attorney's office alleging harassment and over-enforcement based

on a number of incidents at Bogart's.[4]  (A305-A306, A2336-A2338, 641 at

A2530.)  Their complaint identified Nesbitt, among others, as a moving force

behind the persistent harassment.  (A2339.)  The complaint led to no discernible

action or investigation, and Allan Prince, Plaintiff's father, testified "it fell on deaf

ears."  (642 at A2530.)  The district court precluded Allan Prince's further

testimony that the failure to investigate occurred due to friendships between

investigators and members of the First Precinct.  (A2545.)

### Prince's Grand Jury Testimony and the Ensuing Police Harassment

Prince was subsequently subpoenaed to testify before a grand jury regarding

the Fama incident.  (A2286, A2318.)  He was reluctant to testify (365-366 at

A2459), but did so believing it the right thing to do.  (279 at A2438.)  Collins and

three other officers on the scene also testified.  (2775-2776 at A3076.)  One officer

from the First Precinct told Collins he saw Prince in the courtroom.  (2782 at

A3078.)  The grand jury declined to indict Fama and dismissed all charges.

---

[4] According to Griffin, the specific misconduct prompting the complaint included the police asking underage patrons of Bogart's to provide statements that they had been served alcohol at Bogart's when, in fact, they had not.  The Court precluded this testimony since the allegations were not in the pleadings.  (A2393-A2397.)

(A2318-A2319.)  The night after the grand jury concluded, Saturday, February 1

into February 2, 2003, Prince was approached in front of Bogart's by Collins (2726

at A3064), with whom he was acquainted and who previously "was always

courteous and nice to me," Prince testified.  (A2287, 361 at A2458.)  Collins

remarked, "you didn't say anything about me did you?" (A2287.)  Prince

continued,

> I wasn't going to say to him what I said because I heard…that anything I
> said in the grand jury hearing is secret.  So I lied and I said, I didn't say
> anything.  And he turned to me and he said, don't you F'ing lie to me.  I'm
> going to take you out of your F'ing life for what you said in there.  (A2287-
> 2888.)

In his testimony, Collins initially acknowledged he approached Prince (2726

at A3064) and later said Prince approached him.  (2781 at A3078, 2865 at A3100,

2869 at A3101.)  He admitted he asked Prince if he testified before the grand jury

(2726 at A3064, 2782 at A3078), that Prince denied "say[ing] anything about the

police," and added that he "had no reason not to" believe the denial.  (2727 at

A3064, 2784 at A3078.)  He claimed he did not recall making the other statements

Prince attributed to him.  (2865-2867 at A3100-A3101.)  He twice denied saying

he would take Prince out of his life and appeared to be laughing during his second

denial on the witness stand.  (2727-2728 at A3064, 2785 at A3079.)  He admitted

to discussing the outcome of the grand jury with other officers (2730 at A3065) but

denied discussing Prince with them.  (2732 at A3065.)  Collins also testified he

was dispatched on February 1-2 to respond to an overcrowding condition, in which he and other police conducted a count-out. (2875-2876 at A3103.) He added that fire marshals were on the scene and that it was not unusual for police to participate in the count-out. (2786-2787 at A3079.) However, fire marshal records reflect no complaint of overcrowding or fire marshal presence at Bogart's that night (A5013), and other testimony established that count-outs were the responsibility of fire marshals, not police. (A3224-A3225.) A summons was issued that night charging criminal nuisance rather than the more specific charge of overcrowding. (A5016.)

When county police officers came to Bogart's afterwards, both Matthew and Allan Prince testified to a marked change in their attitude, which degenerated into a personal vendetta against Matthew. (A2288, 555 at A2508, 667 at A2536, 701 at A2545.) Now "it was about me," Prince testified, rather than Bogart's being "overcrowded" or "underage," and "[t]hey were there whether they were writing a ticket or not writing a ticket. They sat on the property." (A2288.) Nesbitt and other officers would park their cars on the sidewalk in front of Bogart's door with the lights on so that the front door would essentially bump into the car and patrons could not enter. (A2288, A2297, 374-375 at A2461-A2462, 584 at A2515.) Nesbitt, who had previously "seemed…he was doing his job up until January of '03," according to Prince, now "seemed to come around…almost all the time. He would say to me, this is what happens when you testify against the police."

13

(A2289-A2290.)  He would then say, "I'll see you tomorrow."  (A2290.)  When

Allan Prince approached Nesbitt, having observed him in the vicinity for some

time, and asked him, "can I help you?" Nesbitt replied, "I'm not talking to you, I

want your son."  (582-583 at A2515.)  Nesbitt continued, "he never should have

testified," shaking his head.  (583 at A2515.)  Based on the inaction by IAU

following his October 2002 complaint, Allan Prince did not make a similar

complaint about Nesbitt's conduct.  (704 at A2545.)

 After Prince's grand jury testimony, the police would come four to five days

a week.  (A2295-A2298, 584 at A2515.)  Unlike before, when they would come

when they received 911 calls, they came "every day" regardless of circumstances

at Bogart's.  (A2296, 366-367 at A2459-A2460.)  Allan Prince corroborated this

pattern, adding that police and fire marshals were "constantly" seeking his son.

(A2515, 595 at A2518.)  The number of police who would show up also increased

following Prince's testimony: In contrast to the sergeant and two officers who

would come for earlier premise checks, after January 2003, the visits turned into

raids with the number typically increased to eight to ten police officers.  (A2298-

A2299, 988-989 at A2617-A2618.)  Griffin testified that the number of summonses

issued increased, and the enforcement activity was noticeably expanded, including

more parking enforcement.  (A2325-A2327.)  Prince testified that officers would

no longer greet him as they had before his testimony, reverting to a "distant, cold,

14

nasty" posture toward him. (A2291, A2296.) He "would hear time and time again, that's what happens when you testify against the police" and added that that was said by officers in addition to Collins and Nesbitt, though Prince could not recall their names. (A2296-A2297.)

After the encounter with Collins, to reduce the pressure being exerted on him by police, Prince's parents asked their son to cut his work shifts at Bogart's from five to three days a week. (A2293-A2294.) The other two days, Prince helped his parents find another Bogart's location in New York City, which he ultimately designed, promoted, and staffed with employees. (A2294, A2300-A2302, 603 at A2520.) In a July 2003 hearing of the State Liquor Authority (SLA), in which the First Precinct was a movant against those issued summonses (A2329-A2330), Bogart's had its liquor license suspended August 11 through 21, 2003, and it was fined $10,000 due to summonses issued in 2000 for underage drinking. (A2366, 655 at A2533.)

### Bogart's Change in Ownership

The final straw that forced Prince's parents to sell Bogart's came in August 2003, after police treated an incident involving consensual sex between a deejay and a Bogart's employee as a rape and issued a (later dismissed) underage drinking summons. (A2298, 587-589 at A2516-A2517, 645 at A2531.) Griffin secured a

15

deal with the SLA under which all outstanding tickets would be cleared upon payment of a fine, Allan Prince would surrender his liquor license, and he could get his license back if the sale of Bogart's to a prospective new buyer, David Dobin, did not work out. (590 at A2517.) This settlement included all tickets issued to employees of Bogart's, for which Prince News Corp. was substituted and the employee fines paid by Allan Prince as its corporate representative (661 at A2535), as was standard practice. (672-673 at A2537-A2538.)

The New York City Bogart's officially opened in April 2004. (A2302.) Prince's work at that location continued for about six months afterwards, at which point he left to pursue a consulting agreement with David and Lisa Dobin, who bought the business and subletted the premises from the Prince News Corp. (A2302-2303, A2535.) The Dobins operated Bogart's under the corporation A-Leet Enterprises ("A-Leet") from April 2004 until January 2006 (A2304, A2402, 733 at A2553.) Under the terms of their agreement, Prince's responsibilities were to explain how to run a successful restaurant. (A2303.) He also helped hire the managers. (337 at A2452.) He would be accessible by telephone around the clock to respond to any questions, but he was never required to be physically present at the restaurant (*id.*) because, as he explained to the Dobins, "I felt that the police were targeting myself and I thought it wouldn't be helpful to their business if I was physically at his location." (A2303-A2304.) Prince would have no interactions

with any Nassau County police officers or fire marshals between Bogart's April 2004 opening and a meeting that occurred at Bogart's in March 2005. (A2304.)

The period prior to the March meeting saw a number of orders to remove violations forthwith, which are warning notices as opposed to violations, issued by police officers and fire marshals at Bogart's over the course of several visits. (A2550, A2567, 2986 at A3130, 2991 at A3132.) Officers and fire marshals had the discretion to issue or not to issue violations, or to issue forthwith orders. (2929 at A3116.) Identified violations included problems with the fire system (such as extinguishers not mounted or the condition of exit signs) and overcrowding. (346-348 at A2454-A2455, 787-788 at A2567.) Prince and the Dobins, however, had received verification from the fire alarm company that installed and maintained the system that it was working. (347-348 at A2455.) There were no underage drinking summonses issued during this time. (995-996 at A2619.) Fabrizio Glick, head of security and a floor manager (345 at A2454, 814 at A2574), was responsible for ensuring the establishment was not overcrowded. (817 at A2575.) On several occasions, fire marshals issued summonses for violations—usually in the name of A-Leet (2983-2984 at A3130, A5031-A5032, 2991 at A3132, A5036) and on occasion in Glick's name. (820-830 at A2575-A2578.) Glick testified that when police officers and fire marshals entered during this period, they would not ask for Prince. (719-720 at A2549.)

17

### *The March 2005 Meeting with Law Enforcement*

The Dobins had been frustrated by the numerous visits to Bogart's by fire marshals, which they considered excessive.  (346-348 at A2454-A2455.)  Seeking further direction from the county, they followed up for months with telephone calls to marshals (Prince estimated between ten and thirty calls), but the calls went unanswered.  (A2455, 354 at A2456.)  Prince had advised the Dobins to take measures to avoid overcrowding and underage drinking, but he was not present at Bogart's on any occasion that the Dobins received a summons for such activity. (485 & 488 at A2491, 492 at A2492.)  He also advised them to pursue a meeting with the fire marshals to address their visits.  (A2455.)  According to Prince, Glick, and Chris Greene, the manager at the time, the meeting occurred on March 11. (A2399, 727 at A2551, 998 at A2620.)  It was attended by Prince along with David Dobin; Joe Conway, Dobin's attorney; Glick; Greene; and two fire marshals, Defendant Scott Tusa and Mark DeLuca.  (727-728 at A2551, 1026 at A2628.)

Besides discussing the owners' concerns about the fire system, the fire marshals discussed overcrowding, which Prince could not address since he was not physically present and could only advise the Dobins to adhere to the occupancy limits.  (349-350 at A2455, 1027 at A2628.)  Glick testified that a fire marshal stated at the meeting there would be "a 20 percent leniency" in the future on the

18

issue of overcrowding, that they should make an effort to "keep[] the count as close to" the legal limit "as possible. We are not going to crush you if it's a couple people over." (837-838 at A2580.) Greene also testified to this assurance of leniency. (1000 at A2620.)

Prince "just sat" during the meeting and did not speak. (A2401.) Dobin identified Prince as his consultant. (1086 at A2643.) The meeting included a walk-through to identify issues. (728 at A2551.) Tusa testified he did not know Prince prior to trial but that DeLuca informed him after the meeting that Prince had been in attendance. (2949-2950 at A3121.) In his 2009 deposition, Tusa had admitted knowing of Prince for "in the ballpark" of ten years (A4000), but added he did not know where he learned of Prince's association with Bogart's. (A3996.) At trial, Tusa testified knowing of Prince's 2007 involvement with the location based on a *Newsday* article (A3966), which he testified at his deposition he never read. (A3996.)

### A-Leet Is Forced to Surrender Its Liquor License

Prince, Glick, and Greene testified that on March 12, the day after the meeting, the police and fire marshals appeared at Bogart's and asked for Prince. (A2401, 354 at A2456, 729 at A2552, 748 at A2557, 1028 at A2629.) They testified Tusa was among over a dozen law enforcement officials who appeared,

19

and after ordering the lights and music shut off, they conducted a count of patrons so slowly that there was no business left after they were done.  (A2401, A2552, 1028 at A2629.)  The maximum occupancy for Bogart's was 330, 270 on the main floor and 60 on the lower level, limits that would also apply after Chrebet's would later open at that location.  (417-418 at A2472, 747 at A2557, 1029 at A2629.)  Count-outs by fire marshals would be conducted at the front door, so they would be unable to discern which patrons were coming from which floor.  (747 at A2557, 1029-1030 at A2629, 1152 at A2660.)  This was contrary to established procedure for count-outs.  (1746-1747 at A2814.)

Prince was not present during the March 12 raid, during which Tusa wrote summonses and arrested Glick.  (354 at A2456.)  He was charged with overcrowding, not maintaining a proper count of patrons, and criminal nuisance—the latter charge reflecting, according to records, the first time someone was charged with two violations for the same conduct.  (732 at A2552, A5011-A5013.)  Glick had in fact been keeping count at the front door with a clicker, which indicated exactly 330 people, the maximum occupancy.  (753-754 at A2559, 839-840 at A2580.)  The count did not include employees, but there were only thirteen of them present.  (840-841 at A2580-A2581.)  Glick added how meticulous Dobin was about the count given the meeting held the day before.  (753-754 at A2559.)  The fire marshals also counted 330 people.  (1151 at A2659.)  Greene testified he

20

did not think they were over the limit at all.  (1030 at A2629, 1094-1095 at

A2645.)  While Defendants maintain that employees count toward the totals, Glick

noted that in the period through March 11, counts were conducted by counting

only patrons, not staff.  (892 at A2593.)  Both Prince and Glick felt the arrest

occurred because Glick did not produce Prince to Tusa.  (355 at A2457.)  Glick

testified that the scene upon the law enforcement officials' entry "was

mayhem….[T]hey told us to turn the lights up, turn the music off, and at that point

they were asking for Matt [Prince]."  (729 at A2552.)

Tusa's testimony conflicts with the other testimony in several respects.  He

maintained his response to an alleged overcrowding complaint and Glick's arrest

occurred on March 6, 2005.  (2994-2996 at A3132-A3133, A3916-A3917.)  He

acknowledged that fire marshals came to the location and made a count of 330 on

March 12, but he added that two other fire marshals and not he went to Bogart's

that evening.  (A3917-A3920.)  Tusa further testified that on March 11, 2005, two

attorneys representing Bogart's came to his office unannounced and that at that

meeting, a site meeting and inspection were scheduled for March 15.  (A3921-

A3922, A4024.)  Thus, he maintained, March 15 was the date of the meeting at

Bogart's.  (A3922-A3923.)  He recalled the meeting covered issues regarding the

fire system, but did not recall any discussion of the March 6 or March 12 arrest of

Glick, even though by his account it would have preceded the meeting.  (A3925-

A3928.)

Although Tusa testified he did not direct heightened enforcement following the meeting (A3928), Prince and Greene testified the fire marshals stepped up their enforcement activity afterwards. (348-349 at A2455, 351 at A2456, 1030-1031 at A2629.) Glick testified that Prince's presence at the meeting set the new tone. (834-835 at A2579.) Afterwards, he observed, "It seemed like every time [the police and fire marshals] came in they were asking for Matt Prince." (733 at A2553.) Then, when "we couldn't produce him, [because] he wasn't there, somebody was going to get arrested." (734 at A2553.) Greene's testimony concurred and added that the "police and/or fire marshals" maintained a "constant presence" even in the absence of violations, and it included "giving tickets for off street parking which had never occurred before." (1030-1031 at A2629.) During the few months he remained at Bogart's afterwards, Glick testified this pattern recurred around fifteen or twenty times. (732 at A2552, 735 at A2553.)

Tusa testified based on a log sheet allegedly drawn from fire marshals' reports that marshals made seven visits to Bogart's over five months through March 12, 2005, and seven more visits through the end of the year. (A3929-A3930, A3947, A4035-A4036, A5011-A5012.) Five of the latter visits purportedly followed overcrowding complaints, but the restaurant was found not to be overcrowded on three of those occasions (one of which nonetheless resulted in

22

issuance of a summons). (A3941-A3942, A3947, A5011.) Even putting aside questions of the log sheet's accuracy and comprehensiveness in recording fire marshal activity, that record excludes most law enforcement activity. Another log in evidence reflects police records, and although it likely underreports the harassing police presence at the premise such as that following Prince's 2003 grand jury testimony, it still records that the police came to Bogart's sixty-seven times between 1994 and January 2003, a nine-year period, and ninety-nine times between February 2003 and January 2006, a less than three-year period during which the establishment was closed for six months. (A5014-A5021.) That is a difference of about 7½ incidents per year for nine years versus forty incidents per year for 2½ years. The Dobins were forced to surrender A-Leet's liquor license and cease operations at Bogart's because, Prince testified, they told him "they can't run a business because the police are harassing their business because they know that I'm involved." (342-343 at A2453-A2454.)

### *Prince Is Retained as a Consultant for Chrebet's*

After the Dobins ceased Bogart's operations in January 2006, Prince's parents reacquired the property, and by approximately July 2006, they were able to lift an SLA-imposed two-year ban on liquor sales through a successful state Article 78 action. (A2402-A2404.) At the time, Prince was in negotiations with former

23

New York Jets star and "local hero" Wayne Chrebet, Jr. ("Chrebet, Jr."), whom he had known since the two were suitemates at Hofstra University in 1992, about developing a restaurant at that location. (A2404-A2405, 1173-1176 at A2665-A2666, 1290 at A2695.) In May 2006, Prince and Chrebet, Jr., entered into their first consulting agreement. (A2405, A4950-A4953.) Under the terms of that agreement, Prince would receive $3,000 per week plus 60% of the profits of their business. The agreement had no termination clause, and the property had a lease of twenty-five years. (A2406-A2407, 1178-1180 at A2666-A2667.)

In March 2007, they entered into a second consulting agreement that also included a provision for $3,000 weekly pay and had no termination clause, but the 60% figure for profits was reduced to 55%. (A2407-A2408, A4955-A4957.) Another clause was added to the agreement to reflect their discussions about opening additional locations in Las Vegas, Atlantic City, and New York City. (A2408-A2410, A2667.) Among Prince's contractual duties was that he "serve as a General Manager of Chrebet's Bar and Restaurant." (A4956.) His practical responsibilities included designing the new restaurant, hiring its employees and staff, helping to prepare manuals on service and operations, and finding the right contractor to refurbish and build the restaurant. (A2410-A2412.) For on-site management Prince hired Jenny Shin to manage kitchen and service matters and Chris Greene to manage other aspects of the establishment. (409-411 at A2470-

24

A2471, 1035 at A2630, 1098 at A2646.)  Chrebet's would be modeled as a restaurant and lounge and be geared toward an older clientele.  (245-246 at A2429.)

### *Defendants Force Chrebet's to Terminate Prince*

#### 1.  Chrebet's Opens to a Raid

In March 2007, Chrebet's opened in what was called a soft opening, essentially a trial run to ensure that facilities and service were satisfactory before fully promoting the establishment.  (237 at A2427, 1290-1291 at A2695-A2696.) The lower lounge area was not yet open to patrons.  (237 at A2427.)  During this phase, Prince had no interaction with fire marshals or police officers from the First Precinct.  (238 at A2427.)  There were also no issues with respect to the Nassau County Police Department or Fire Marshal's Office.  (1099-1100 at A2646-A2647, 1184 at A2668, 1291-1293 at A2696.)  Defendant Richard Soto stated in a Form 44 "licensed premises report" that he came by Chrebet's on Saturday, April 28, 2007, at 11:20 p.m., at which time forty-four patrons were present, but his subsequent testimony admitted the location was under light construction and he did not think it was open for business.  (A3753-A3755, Ex. SS, 3800.)  The Form 44 acknowledged the establishment had a public assembly license that would expire March 9, 2008, and erroneously identified Jenny Shin as the general manager.

(A5042.)

The grand opening for the entire restaurant was scheduled for June 14, 2007. (239 at A2428.)  Shortly after midnight on June 15, police officers and fire marshals raided the establishment, arriving in about ten police and fire department vehicles with lights flashing.  (240-241 at A2428, 757 at A2560, 1185 at A2668.) Among the law enforcement officers present were Defendant-Appellees Tusa and Soto and Fire Marshal Paul Szymanski.  (246-247 at A2429-A2430, A3156.) Various officers testified they were responding to an anonymous call for overcrowding that was made not to 911, but to the fire marshals' number, 742-3300.  (2904 at A3110, A3247-A3248, A3948, A5043-A5044, A5049.)  A dispatcher notified Szymanski of the call at 11:58 p.m. (2890 at A3106), and law enforcement arrived at the location five to ten minutes later.  (A3159.)  Prince had no contact with the law enforcement officers during the raid because he was upstairs in the restaurant's office.  (247 at A2430, 442 at A2478.)  Szymanski initially testified he "didn't know who Matthew Prince was" at the time.  (A3161.) He later admitted he had "heard the name" prior to June 15 from others in the fire marshal's office and knew Prince "was a manager for…Bogart's."  (A3225-A3227, A3276.)

Chrebet, Jr., Greene, Glick, and Gregory Pranzo, a restaurant entrepreneur and former competitor of Prince who was helping with the grand opening, testified

that upon arriving, one of the county law enforcement officers (Tusa according to Chrebet, Jr., and Greene) asked for Prince as soon as he arrived.  (758 at A2560, 903-904 at A2596, 910 at A2598, 934 at A2604, 1039-1040 at A2631-A2632, 1185-1186 at A2668.)  According to Greene's testimony, police and fire marshals

> walked through the front doors…and said where is Matt Prince, I said Matt Prince is not in charge, I'm in charge right now.  The person running the facility.  We want Matt Prince.  I said Matt Prince is not here, Wayne Chrebet, the owner, is here, if you'd like to speak to him. (1039 at A2631.)

Greene introduced Tusa to Chrebet, Jr., who extended his hand for a handshake, but Tusa refused to shake it.  (1040 at A2632, 1186 at A2668.)  Tusa did not deny that based on his preference "not to touch people that I don't know." (A3955.)  According to Chrebet, Jr., Tusa asked him who was in charge.  (1298 at A2697.)  He responded to the question as the owner without mentioning Prince. (1298-1299 at A2697-A2698.)  Tusa then asked, "where's Matt Prince." (1186 at A2668, 1298 at A2697.)  Chrebet, Jr., replied, not having seen Prince in a while, "he's not here."  Tusa then asked again, "I want to see Matt Prince," to which Chrebet, Jr., repeated his answer.  (1186-1187 at A2668.)  Tusa initially denied he asked for Prince.  (A3966, A3993.)  In his deposition testimony, however, he had stated he did not recall asking Chrebet, Jr., for Prince, and conceded "[t]hat's possible" that he asked "the guy who was on duty at the door" where Prince was. (A3994-A3996.)

27

Tusa ordered the restaurant's lights on and the music stopped and conducted a count-out by the door. (A2632, A3955-A3956.) The police officer who stood with Tusa covering the front area during the count-out and with whom he later exchanged information was a Sergeant Driscoll (A3951, A3962, A4065-A4066), who did not testify, despite still remaining in the First Precinct. (A4018.) The count-out was protracted for over an hour, and the patrons were not permitted to return to the restaurant, so it closed. (241-242 at A2428, 444-445 at A2479, 1042-1043 at A2632.) Greene noted that this marked a contrast to licensed premise checks he had been involved in while working at various restaurants, which would usually be limited and quick. (1042-1043 at A2632.) Chrebet, Jr., who wanted to count with the fire marshals, was not permitted to do so (1189-1190 at A2669), and police officers removed Greene to the side of the building rather than permit him to observe the count-out. (1111-1113 at A2649-A2650.)

Szymanski issued summonses to Chrebet's, Inc., for overcrowding and for a back gate that was locked. (243 at A2429, 1310 at A2700, A3185-A3187.) The summons charged that 573 patrons were in the restaurant (A3188-A3190, A5047), sometimes cited by law enforcement as 575 (A3763, A3958-A3959)—figures that Chrebet, Jr., Greene, and Glick, who served as Chrebet's security manager, dispute. (445-446 at A2479, 759-761 at A2560-A2561, 1041 at A2632, 1102 at A2647, 1189 & 1191-1192 at A2669-A2670.) As Chrebet, Jr., told Szymanski, the

28

gate never did in fact have a lock; it had a latch on the inside, and patrons could open the gate by pushing the latch.  (243-244 at A2429, 438 at A2477, 762 at A2561, 859-860  at A2585, 1050 at A2634, 1190-1191 at A2669, A3219-A3223.) Chrebet, Jr., considered the police conduct to be "harassment" and "overkill." (1332-1333 at A2706, 1369 at A2715.)

### 2.  Prince's Arrest on the Night of June 21-22, 2007

One week later, on June 21-22, 2007, Prince was managing Chrebet's; Chrebet, Jr., had asked him to talk to officers if they walked in.  (247-248 at A2430.)  Prince found the request unusual, but Chrebet, Jr., told him, "I'm asking you to do me a favor," that "until I have a sitdown with" attorney Joseph "Margiotta, [Nassau County Executive] Tom Suozzi, a fire marshal, a policeman, I'm not coming back to this place.  Please, if they come into this place, could you please talk to them."  (451-452 at A2481.)

That night, another raid was conducted by about ten police officers and fire marshals, including Soto.  (764 at A2561.)  Approximately 100-150 people were in the restaurant that night, perhaps 80-100 during the raid, and there were no incidents earlier that day or that night requiring the presence of police officers or fire marshals.  (250 at A2430, 450 at A2480, 766 at A2562, 916 at A2599, 957 at A2610.)  Soto testified he came to Chrebet's in response to "a call for a fight

29

happening inside and outside the location" (A3345), but he admitted seeing no evidence a fight had occurred. (A3790.) Prince had no knowledge of a 911 call that night and did not see a fight. (453-454 at A2481.) Prince and several law enforcement witnesses acknowledged the occurrence of unfounded 911 calls, often by disgruntled patrons. (448 at A2480, 1842 at A2838, A3154-A3155.)

Upon arriving, both Glick and Pranzo testified, Soto asked, where is Matt Prince? (765 at A2562, 917 at A2600.) Soto denied this (A3689), testifying that he asked who was in charge and, not getting an answer, repeated the question. (A3347-A3348.) Glick walked over to Prince and said Soto would like to speak to him, so Prince approached him and told him he was the person in charge that evening. (251 at A2431, 455 at A2482.) This was the first time Prince ever met Soto (having seen him once before—during the previous week's raid—on video camera). (455 at A2482, 1120 at A2652, A3689.) Prince testified that Soto "gave me a smile" and said, "so you are Matt Prince. I'm going to be your new Sergeant Scalone"—a reference to the sergeant who "shut down Bogart's prior to it becoming Chrebet's." (251 at A2431.) Soto denied making that comment. (A3651.)

Although copies of Chrebet's licenses were framed and leaning against the wall, visible to patrons, Soto asked to see the original licenses. (252-253 at A2431, 455-456 at A2482, A3634, A3792.) Those were kept in a binder in the restaurant's

30

office, out of concern that original licenses not be damaged. (253-254 at A2431.)

Prince was unfamiliar with a law requiring the original liquor license to be posted

and until this incident never had an officer tell him there was a problem displaying

photocopies. (299-300 at A2443, 339 at A2453, 440 at A2478.) Back when he

worked for his father at Bogart's, Allan Prince changed his practice from

displaying original licenses to displaying photocopies at the advice of a police

officer, who told him that on "a busy night, some customer is going to grab that

and put it up into his dormitory room as a souvenir," so keep the original "upstairs

locked under lock and key in your office." (600 at A2519, 603 at A2520.) Greene

also had not been informed by Nassau County law enforcement that photocopies

were inadequate, and in his experience with numerous restaurants, he found some

did and some did not observe this rule. (1003-1005 at A2621-A2622.) Soto

testified he had told Jenny Shin during his April 28, 2007, visit to Chrebet's that

the originals are supposed to be displayed (A3309), but Shin had not informed

Prince of this. (411 at A2471.) During the raid of June 14-15, Soto again noticed

that the licenses were in a binder and not on the wall, after which he told Chrebet,

Jr., that the originals needed to be displayed, as he had told Shin. (A3332-A3333,

A3768.) Soto later testified he did not recall using the word "original." (A3782.)

He did not record his alleged directives to Shin and Chrebet, Jr., in his Form 44

reports. (A3899-A3900.)

31

Prince obtained the binder from Glick, who brought it down from the office to show him the licenses.  (456 at A2482, 863-864 at A2586.)  He found the liquor license,[5] but Soto testified Prince was having a difficult time locating the public assembly license when the officer requested it.  (A3634-A3636.)  Despite the fact that Soto had seen the public assembly license on April 28 (as reflected in his Form 44, A5042) and June 15 (A3905), at some point, Soto asked Prince for his driver's license and went out to his police car for approximately ten minutes.  (254 at A2431, A3637.)  From the car, Soto checked for outstanding warrants on Prince, which he testified was practice when issuing an individual a summons (A3638-A3639), although he admitted he did not run a check on Shin or Chrebet, Jr., during his two recent conversations on the same license issue.  (A3795-A3796.)  His stated reason for treating Prince differently is he was not writing a summons in the prior cases (A3893-A3894), but that begs the question why Prince would be singled out for a summons under identical facts.  There is a conflict in testimony between Fitzgerald, who testified Soto called him prior to arresting Prince (2431-2432 at A2989-A2990), and Soto, who testified he contacted Fitzgerald after the arrest.  (A3796-A3797, A3822-A3823.)

Prince testified that Soto returned from the car "with a nice smile and he said

---

[5] At one point, Soto contradicted his testimony by saying Prince failed to produce a liquor license, but then reverted to his earlier answer.  (A3806-A3807.)  Additionally, Prince's arrest report states Glick had "produced both licenses" from the binder (A3810-A3811, A5052), which contradicts Soto's testimony.

to me, isn't today my lucky day" and added, "I get to arrest you." (254 at A2431, 463-464 at A2484.) Glick, who was standing behind Soto during the arrest, corroborated he "said something about a lucky day." (866 at A2587, 894 at A2594.) Soto denied making such a statement. (A3650-A3651.) Prince testified he was pushed up against the wall and put in handcuffs. (254 at A2431, 465-466 at A2484.) Soto testified that an officer accompanying him, Marlon Sanders, handcuffed Prince, but denied he was pushed against the wall. (A3648.) Still in the presence of patrons, Prince asked Soto and other officers present to loosen the handcuffs "because they were extremely tight." (255 at A2432, 466-467 at A2484-A2485.) Prince received no response until he renewed his request in the police car that took him to the First Precinct. (255 at A2432, 468 at A2485.) He was transferred from the First Precinct to Police Headquarters in Mineola and was in custody until late the following morning. (255 at A2432, 470 at A2485.) At the request of the police, the lights were on in the restaurant, and the music was off. (563 at A2510, 854-855 at A2584, 918 at A2600, A3632.) Chrebet's closed that night after Prince's arrest since patrons did not want to stay with police present and lights on. (766 at A2562, 867-868 at A2587.)

The charge against Prince was an open ticket that had erroneously not been closed. On September 15, 2005, a bench warrant was issued by the Nassau County District Court for Prince based on his failure to appear in response to tickets issued

33

in September 2003.  (A2377-A2378.)  Apparently, Griffin testified, the bench

warrant merely reflected that one of the three summonses somehow "fell off the

docket" and "got missed."  (A2376, A2378, A2383-A2384.)  "I will tell you it

wasn't Mr. Prince's fault," Griffin asserted.  (A2385.)  The injustice to Prince is

even more apparent given that one summons, issued by Fire Marshal Michael

Krummenacker on September 27, 2003, had charged him for overcrowding, even

though the summons noted "221 persons inside occupancy"—clearly lower than

the 330 permitted.  (A5027-A5028.)


### 3.  The June 27, 2007, Meetings with Chrebet, Jr.

The June 22 incident effectively ensured the end of Prince's consulting

agreement with Chrebet, Jr., who did not want Prince near the premises until he

figured out what was going on.  (258 at A2432, 1194 at A2670.)  Chrebet, Jr.,

contacted attorney Margiotta to help him "figure out what to do as far as the

authorities are concerned."  (1195 at A2670.)  He contacted him because

Margiotta, the former chairman of the Nassau County Republican Party (1687 at

A2799), "was a very powerful figure in Nassau County."  (1325 at A2704.)  He

thought Margiotta could set up a meeting and "would bring people to the meeting

that certainly had power and influence."  (*Id.*)  Margiotta helped organize a

meeting and "said he would bring someone from the fire marshals."  (1196 at

A2671.)  On June 27, 2007, the meeting occurred at Chrebet's, attended by

Chrebet, Jr.; Margiotta; Fire Marshal Krummenacker, invited by Margiotta; and

possibly Frank Antetomaso, a Republican committeeman.[6]  (A2671, 1326 at

A2704.)

Kevin Lowry, an assistant police chief and deputy chief of the support

division (1893 at A2852), was also at Chrebet's at the time, but by nearly all

relevant testimony, he sat at the bar while the meeting occurred in another section

of the restaurant.  (1203 at A2672, 1215-1216 at A2675-A2676, 1935 at A2862.)

Krummenacker initially testified Lowry was seated at the table with the others

(1707 at A2804) but later testified he did not recall that detail.  (1822 at A2833.)

Lowry testified Chrebet, Jr., had told him in a phone conversation of problems

involving police and fire marshal visits and invited him for lunch (1885-1887 at

A2850), but Chrebet, Jr., denied extending such an invitation.  (1327-1328 at

A2705.)  At some point before or after that alleged call, Lowry testified he called

the commanding officer of the First Precinct, Mike Studdert, whom he knew

"[v]ery well" (1920 at A2859), to ask him what took place, and Studdert

"explained that the police and the fire marshals had been there and did a count-

out."  (1888 at A2851, 1924 at A2860.)  Lowry hoped that Studdert would "ask his

people to exercise some discretion out there, to try to help Wayne Chrebet

---

[6] Antetomaso and possibly his grandson were present, but they left the table prior to the meeting, according to Krummenacker.  (1707 at A2804, 1822 at A2833.)

succeed." (1922 at A2859.) He explained to him "that this was a new establishment in what we call [the] hub area, and we" (meaning "the county") "had an interest in seeing businesses thrive in that area." Studdert agreed. (A2851.) Studdert subsequently told Soto Lowry had inquired about Chrebet's. (A3695-A3696, A3816-A3817.)

Lowry also called Patrick O'Connor, former commanding officer of the First Precinct (2790-2791 at A3080) and a deputy chief in the patrol division, prior to the lunch meeting. (1890-1891 at A2851). He conveyed to O'Connor, who ranked above Studdert, the same message he conveyed to Studdert. (1926 at A2860.) Lowry thought he "might be able to help [Chrebet, Jr.,] because I have some good management experience, and I had a very good rapport with a lot of people at the county at the time," including Nassau County Executive Suozzi and the other police chiefs. (1893-1894 at A2852.) Prince and Lowry had met only once before, when the latter came to the restaurant one week earlier wanting to meet and/or get an autograph from Chrebet, Jr. (259-260 at A2433, 1884 at A2850, A2861.) Prince had called Lowry and possibly left him a voicemail after his June 22 arrest and prior to the June 27 meeting. (1915-1916 at A2857-A2858.)

Krummenacker served in the fire marshal's office since 1994 and knew from routine inspections of the location (without recalling when) Prince was a manager at Bogart's. (1640 at A2787, 1644-1646 at A2788-A2789.) He testified at one

point he had issued an overcrowding ticket to Prince personally on November 7,

2003 (1652 at A2790), but later modified his testimony to say he did not recall

that. (1795 at A2826.) He testified the general practice was to issue summonses to

the corporation during licensed premise checks,[7] including several from the 1990's

issued to Prince News Corp., unless the individual was uncooperative or refused to

identify himself. (A2790, 1747-1749 at A2814.) In Krummenacker's experience,

he said, Prince never was uncooperative. (1834-1835 at A2836.) Notwithstanding

this testimony, evidence shows he wrote at least one summons in Prince's name in

2003—the aforementioned baseless overcrowding ticket. (A5027-A5028.) He

testified he had also been present at the location at other times, including June 22,

2007, after the count-out had already occurred. (1809-1812 at A2829-A2830.) He

was the duty inspector that evening. (1811 at A2830.) During that visit, he did not

observe any violations. (1728 at A2809.) Krummenacker initially gave testimony

that he was present at Chrebet's after midnight on June 15, 2007 (1680-1683 at

A2797-A2798), but he later stated he was not there that date. (1835 at A2836.)

This "correction," however, is belied by his testimony that he was called to

Chrebet's on an overcrowding report (1677-1679 at A2796-A2797), which was the

predicate for the earlier raid, but not for the June 22 raid.

---

[7] Fitzgerald also testified this was practice and added he never wrote tickets for any licensed premise in the name of the person in charge as opposed to the licensed entity or the name of the person on the license. (2639-2640 at A3042.)

Krummenacker knew Margiotta from political functions and his friendship
with Antetomaso (1818-1819 at A2832), who invited him to the meeting. (1691-
1694 at A2800-A2801.) Chrebet, Jr., testified the purpose of the meeting was "to
find out what could be done to stop the raids." (1199 at A2671.) Krummenacker's
testimony about the meeting is contradictory. At two points, Krummenacker
acknowledged he knew going in "that the purpose of the meeting was to address
problems that Chrebet's was experiencing with the police and fire marshals"
(1694-1695 at A2801, 1840 at A2837), but at two other points, he denied knowing
that the meeting was about police and fire marshal activity (1704-1705 at A2803,
1819-1820 at A2832)—despite his own presence at the site following the June 22
raid. Krummenacker initially acknowledged the meeting opened with Margiotta
saying something to the effect of "What can you do to help me address the fire
marshal situation?" (1708 at A2804.) However, he later testified, "I don't
remember anything" being requested "about the fire marshal." (1717 at A2806.)
According to Krummenacker, Margiotta expressed his concern on behalf of
Chrebet, Jr., noting the money he had invested as well as the benefits of the new
business to Hofstra University, of which the former GOP chairman was a booster.
(1823 at A2833.) Although Krummenacker had testified at one point that he did
not have authority to change the fire marshals' actions (1725 at A2808), he later
testified that, in response to Margiotta's expressed concern, "I would be happy to

38

lend whatever assistance I possibly could." (1823 at A2833.)

There is a dispute as to what else was said during the meeting. Chrebet, Jr., testified that "Matt Prince came up" when, in reference to "the raids from the police and the fire marshals" discussed by Margiotta, "Mr. Krummenacker said the kind of problems I was going to have is because Matt Prince was involved." (1198 at A2671.) Those problems "would continue" with Prince involved, so Krummenacker "suggested that I sever ties with Matt." (*Id.*, 1332 at A2706.) Krummenacker denied he instructed Margiotta to terminate Prince. (1721 at A2807, 1827-1828 at A2834.) He testified Margiotta said "it sounds like the problem is with your manager." (1716 at A2806, 1722 at A2808.) Krummenacker initially admitted he did not know "the specific conversation that led to that comment" (1722 at A2808), but he later changed course and testified it came after he (Krummenacker) explained the expectations of fire marshals. (1825-1827 at A2833-A2834.) Chrebet, Jr., denied that Margiotta made a statement about having a problem with his manager. (1336 at A2707.) Margiotta himself was deceased by the time of trial. (1365 at A2714, 1379 at A2718.)

Krummenacker's further testimony was also contradictory: he initially testified that Prince's name was not uttered during the meeting (1716 at A2806), but later responded "I don't recall" when asked whether Chrebet, Jr., ever identified Prince "as the manager of the premises" during their meeting (1827 at

39

A2834)—and whether Chrebet, Jr., ever expressed to him "an intention to terminate his relationship with Matthew Prince." (1828 at A2834.) Initially, he testified that at the time of the meeting, he "knew that [Prince] was a manager" at Chrebet's (1716 at A2806), but he later testified he "probably [did] not" know at the time of the meeting that Prince was working there "[a]s a manager." (1827 at A2834.)

Krummenacker testified he told Chrebet, Jr., he was not posting the restaurant's original certificates and licenses in compliance with the law. (1823-1824 at A2833.) Chrebet, Jr., however, did not recall Krummenacker discussing general legal requirements for the restaurant. (1330-1331 at A2705-2706.) When Krummenacker was asked whether Chrebet, Jr., said during the meeting, "I think you're harassing me," he first denied it (1722 at A2808), but subsequently conceded he said "[s]omething to that effect." (1723 at A2808.) Still later, he admitted it and added the comment arose in the context of discussing requirements regarding the display of licenses (1825 at A2833), though he also admitted he had testified he saw no violations during his June 22 visit to Chrebet's, despite not seeing signs and licenses properly posted. (1837 at A2836.) He initially testified that the topic of getting rid of Prince did not come up during the meeting. (1721 at A2807.) Asked later whether he learned of Prince's termination by Chrebet, Jr., after the meeting, Krummenacker initially stated, "I don't recall" (1840 at A2837),

40

but upon the next question admitted, "I think there was something mentioned in the [fire marshal's] office" about it, perhaps by Fire Marshal DeLuca, "because that was his inspections area." (1841 at A2837.)

Following the meeting, Krummenacker, Margiotta, and a third person Lowry believes was a fire marshal (1913 at A2857, 1934 at A2862) spoke with Lowry at the bar "about the issues that were taking place" at Chrebet's "involving law enforcement." (1897 at A2853.) Lowry initially testified he did not remember whether Krummenacker made any reference to Prince during this conversation (1898 at A2853) and later denied there was any discussion of an employee of Chrebet's being terminated. (1936-1937 at A2863.) After that conversation, Chrebet, Jr., spoke with Lowry at the bar and testified as follows: Lowry "had a conversation with Mr. Margiotta...and when he came back over to me, I explained to him what happened and I told him I was going to get rid of Matt and he said I made the right choice." (1204 at A2673, 1336 at A2707.) Chrebet, Jr., further testified he told Lowry the reason for severing Prince was to avoid a continuation of raids at the restaurant. (1205 at A2673.)

Lowry initially testified he did not recall discussing the topic of terminating Prince (1899-1900 at A2853-A2854), including whether he said that getting rid of Prince was a good idea. (1915 at A2857.) He later denied that Chrebet, Jr., discussed the subject. (A2863, 1953 at A2867.) He added that Chrebet, Jr.,

41

wished to utilize parking spaces across the street, in response to which Lowry

testified he spoke to County Executive Suozzi to facilitate a meeting. (1938 at

A2863, 1943 at A2864.) (Among Lowry's responsibilities had been to assist the

Deputy County Executive for Public Safety with the various county departments in

his jurisdiction, including the police. (2212-2213 at A2933.)) Lowry also testified

to a phone conversation after his initial meeting with Chrebet, Jr., in which the

latter "asked me if I thought he should fire Matt Prince." (1911-1912 A2856-

A2857.) He added he was "not sure" whether that was the first time Chrebet, Jr.,

had ever raised the issue of firing Prince with him. (1940 at A2864.) Lowry

testified his response to this question was "I really couldn't tell him how to run his

business, but…a management position is a critical position." (1940-1941 at

A2864.)

 At some point, Lowry testified, Chrebet, Jr., told him "he thought the police

were taking a heavy-handed conduct, and I assured him the activities as I saw them

were normal." (1942 at A2864.) Lowry had a second conversation with Studdert

after the lunch in which he recommended trying to help Chrebet, Jr., succeed in his

business. (1902 at A2854.) He hoped the police "would exercise their discretion"

in giving out summonses, meaning "[t]hey are not required to" do so "for any

violations that they observe." (1903-1904 at A2854-A2855.) Lowry added he had

another conversation with Deputy Chief O'Connor, who had direct control over the

42

First Precinct, as well, conveying the same request.  (1910-1911 at A2856, 1947 at A2865.)  When asked whether such courtesies were in fact given to Chrebet's afterwards, Lowry initially testified, "I have no firsthand knowledge."  (1947-1948 at A2865-A2866.)  He then acknowledged discretion was shown to Chrebet's after being read his deposition testimony in which he said he "was certain" from conversations with O'Connor and Studdert that those they supervised exercised discretion.  (1948-1950 at A2866.)

Chrebet, Jr., testified the only factors behind his decision to terminate Prince were the meeting with Krummenacker—adding that "[h]earing from an authority that you have to, you know I kind of had to listen to that"—and the nights of the two raids.  (1341 at A2708, 1355 at A2712, 1374 at A2716.)  He believed Krummenacker had the authority to stop the raids both because Margiotta by practice brought him to people with authority and because Krummenacker himself indicated that the raids would cease if he got rid of Prince.  (1342 at A2708, 1367-1368 at A2715.)  He added that his conversation with Lowry "solidified my decision."  (1356 at A2712.)

### 4.  The Meeting with County Executive Suozzi and Prince's Termination

On July 2, 2007, Margiotta and Chrebet, Jr., met with County Executive Suozzi in Suozzi's office (A4942)—a meeting arranged in apparently separate

43

efforts by Margiotta (1211 at A2674, 2213-2214 at A2933-A2934) and Lowry (1943-1944 at A2864-A2865). Suozzi did not recall having any conversation with Lowry (2220-2222 at A2935-A2936), who would not attend the meeting himself, but Lowry testified he "mention[ed] to" Suozzi "that there had been some police enforcement activity at that location." (1944 at A2865.) According to Chrebet, Jr., he and Margiotta told Suozzi at their meeting that Prince was no longer involved with his restaurant, that "I had done the right thing" and "I was going to do well now." (1211-1212 at A2674-A2675.) Upon being told of Prince's termination, Chrebet, Jr., testified Suozzi "acknowledged that he was aware of that." (1229-1230 at A2679.) At trial, the only relevant detail Suozzi testified he recalled about the meeting was Margiotta's request for him to assist Chrebet's in obtaining additional parking near Nassau Coliseum. (A2934, 2222-2223 at A2936, 2233 at A2938.) Otherwise, he testified he had "[n]ot a clue" about other details of that day. (2225 at A2936.) He was aware of Margiotta's stature as a former chairman who "was very active in Nassau County life" (2212 at A2933) and found it "significant…that Mr. Margiotta asked me for a favor." (2233 at A2938.)

On July 5, 2007, Prince's consulting agreement with Chrebet, Jr., was terminated. (260 at A2433.) Both Prince and Chrebet, Jr., testified the termination was not voluntary, but occurred as a result of the raids of June 14-15 and June 21-22 and the June 27 meeting with fire marshals and police. (261 at A2433, 557-558

at A2509, A2673.)  Prince also testified the actions of the Nassau County Police Department and Fire Marshal's Office were the sole reason for the termination of his consulting agreement.  (519 at A2499.)  No testimony at any point in the trial by either of the Chrebets or by any personnel who owned or worked at the establishment (either as Bogart's or as Chrebet's) ever included any criticism of Prince's job performance.  In fact, Prince testified he and Chrebet, Jr., were "very close friends" until after the June 27 meeting.  (558 at A2509.)  Chrebet, Jr., testified that he and Prince are no longer friends.  (1223 at A2677.)  The restaurant was profitable at the time of Prince's termination.  (1210 at A2674, 1364 at A2714.)  After Prince's termination, revenue dropped, and Chrebet's ultimately was not financially successful.  (1221-1223 at A2677, 1364 at A2714.)

Under the termination agreement, Chrebet, Jr., agreed to pay Prince approximately $1.5 million by January 2008.  (261-262 at A2433, 504-505 at A2495-A2496.)  Prince in fact received less than half that amount.  He noted $1.5 million was inadequate, because Chrebet's was expected to make up to $2 million per year.  (262-264 at A2433-A2434, 505 at A2496, 562 at A2510.)  Under the agreement, Prince anticipated numerous business opportunities in Las Vegas, Atlantic City, and New York City.  (264-265 at A2434.)  His opportunities included discussions with boxing champion Arturo Gatti, a close friend of Chrebet, Jr., and New York Yankees slugger Reggie Jackson about developing additional

45

restaurants, but those opportunities vanished after Prince informed them of the situation at Chrebet's.  (265-266 at A2434, 271-272 at A2436.)

### *Defendants Effectively Bar Prince from Working Again in the Hospitality Field*

#### 1.  The Raids of November 9 and 10, 2007

Prince ceased all active consulting at Chrebet's and physically returned to the restaurant only once—in August 2007, to pick up a check and eat.  (272-273 & 275 at A2436-A2437.)  Prince's termination ended Chrebet's problems with law enforcement personnel "[f]or a while," according to Chrebet, Jr., until "[l]ater [in] the year they came back again looking for Matt."  (1212 at A2675, 1220 at A2677.)  At approximately 2:51 a.m. on November 9, 2007, another police visit occurred at Chrebet's consisting of numerous officers.  (920-921 at A2600-A2601, 766 & 768-769 at A2562-A2563.)  This followed a 911 call by Chris Greene after an unruly patron refused to leave the premises.  (1044 at A2633, 1119-1120 at A2651-A2652.)  Upon arriving, Defendant-Appellee Richard Hermann came in and asked for Prince, Greene and Pranzo testified.  (766-767 at A2562, 921 at A2601, 1044 at A2633, 1120 at A2652.)  Hermann denied this and stated he did not know Prince or hear his name before.  (1975 at A2872, 2073 at A2897.)  Hermann had been promoted to sergeant at the same time as Soto (1968 at A2871, 2018 at A2883) and was first assigned to the zone in which Chrebet's was located

46

in October 2007.  (2406 at A2983.)

Greene testified he replied to the officer, "Matt Prince is not here, I have a problem with a patron right here and [Hermann] proceeded to ask me again where is Matt Prince, is he working this weekend.  I said no, he's not working this weekend."  (1044 at A2633.)  After Hermann asked for Prince the second time, Greene testified, "I was very hesitant to inform him, he told me that…if I didn't inform him where Matt Prince was that he would arrest me, I said Matt Prince is no longer here."  (1045 at A2633, 1125 at A2653.)  Hermann testified he had to ask three times who the manager was (1978 at A2873), but Greene disputes that.  (1121-1122 at A2652.)  Hermann testified Pranzo identified himself as the promotions manager, said "there was a person named Jason who was the manager, but Jason was afraid to identify himself to the police."  (1979 at A2873.)  Hermann told Pranzo he would return with a Town of Hempstead building inspector and fire marshal.  (1990-1992 at A2876-A2877.)  He did not run Pranzo for warrants.  (2384 at A2978.)  Greene testified that after asking for Prince, Hermann went up to the private office (767-768 at A2562), and Hermann testified he did so to view surveillance video.  (1976 at A2873, 1979 at A2873.)  Greene found Hermann's conduct upsetting and outrageous, but he did not make any complaints about it.  (1125-1126 at A2653.)

47

At approximately 5:03 a.m., Hermann sent an email "to all the sergeants,[8] all the lieutenants, if there is a captain, the commanding officers, and the deputy office" in the First Precinct (1981 at A2874), asserting,

> The manager Jason refused to cooperate with me and claimed that he was not in charge and did not know who was. Gregory Pravza [sic] told me he was the promotions manager and that Jason was in charge but was afraid to admit it. I warned jason that if he did not cooperate I would be back with the Fire Marshall and TOH Building Insp. I will take a zero tolerance approach there. FYI" (1984 at A2875, A4944.)

Hermann admitted that, contrary to the email, he never spoke to anyone named Jason and did not "know if there was a Jason there." (1986-1987 at A2875.) He added that feeling the staff at Chrebet's were giving him a hard time was a factor in calling a multi-departmental raid. (2381-2382 at A2977.)

The next raid followed at approximately 1:20 a.m. on November 10, 2007, when police, fire marshals, and representatives of the SLA and Town of Hempstead Building Department came to Chrebet's. (A2563, A2612, 1047 at A2633.) There were about eight officers total (2005 at A2880), including Hermann and Tusa. (A3967-A3968.) Although Hermann would file a Form 44 calling the visit a "routine inspection" (A5063), he testified he would bring two to five officers to such inspections, not other departments (1960 at A2869, 2014 at A2882), and that he "never had an occasion to do a routine inspection" at Chrebet's. (1968 at A2871.) In other testimony, he called this the only "bar

---

[8] There are 15 patrol sergeants in the First Precinct. (2620 at A3037.)

detail" he had done in which he brought in all those entities (1998 at A2878, 2017 at A2883), and Chrebet's "was the only location we visited that night….I wanted to let them know they needed to cooperate with the police department." (2004 at A2880.) Hermann admitted they were not responding to a 911 call or any violation (2006 at A2880) and there were about 30 patrons at the time. (2008 at A2881.)

As before, Glick, Pranzo, and Greene testified, when the officers entered the premises, Hermann asked for Prince. (771 at A2563, 925 at A2602, 1047 at A2633.) Hermann denied this. (2005 at A2880, 2308 at A2957.) After the officers were again informed Prince was not in charge, they asked who was; Greene was afraid to say he was in charge, but Pranzo, the other manager on duty, said that he was. (1047 at A2633, 1123-1124 at A2652-A2653, 2403 at A2982.) A protracted count-out followed with the lights up and the music off. (1048 at A2634.) The building inspector issued four summonses. (2010 at A2881, A3980-A3981.)

Glick decided around this time to go into another line of work. (771-772 at A2563.) Every time he saw Hermann, he testified, the police sergeant would ask for Prince. (882 at A2591.) Pranzo left that December. (928 at A2602.) In all his time operating businesses on Long Island and in New York City, he testified, he never experienced the kind of raids or the frequency—four raids in less than six months—he encountered working at Chrebet's. (975 at A2614.)

49

### 2. Additional Police and Fire Marshal Activity in Early 2008

Soto returned to Chrebet's for the first time since June 22, 2007, on January 13, 2008, in response to an underage drinking call—though he observed no underage drinking when he arrived.  (A3814, A3827, A3897.)  Soto spoke with a manager named Max Feinberg that night, asked him for his driver's license, but did not run it for warrants or write him summonses.  (A3815, A3898.)

On February 1, 2008, at approximately 11:27 p.m., Greene called the police after dealing with an unruly patron, and Hermann responded to the call.  (1050-1051 at A2634.)  After Greene greeted him and noted he had an incident, he testified Hermann responded by asking for Prince, and Greene again told him Prince no longer worked there.  (1051 at A2634.)  Hermann issued a summons for having a deejay without a cabaret license—the first such summons he had ever issued (2398 at A2981)—and a warning for disorderly premises.  (2312 at A2958, 2343 at A2967.)  On or around February 24, 2008, Hermann returned to Chrebet's in response to a phone call and continued to ask Greene about Prince.  (1132 at A2655.)

Although he testified that staff had been cooperative on November 10 (2009 at A2881) and February 1 (2021 at A2884), on March 3, 2008, Hermann sent an email to John Capece, then the commanding officer of the First Precinct, to

50

propose another multi-departmental raid.  (2023 at A2884, 2349 at A2969.)  By

virtue of Capece's position, "ultimately he is responsible" for all the activity of

officers in his command.  (2354 at A2970, 2386 at A2978.)  Hermann's email

stated,

> I will be working this Friday and I would like to call out the Fire
> Marshall,Building Inspector and possibly the SLA.  I would like to go to
> Chrebet's, The Roti restaurant on Front Street (appears to be an illegal social
> club) The Golden Crest on Jerusalem, and Cahoots in East Meadow.
> The head of security at Chrebets claims to be retired from our ESU
> [Emergency Service Unit].  He said that they will be using the promoter
> from Rapture every Friday,and that Mathew Prince the former owner of
> Bogart's is now running the place.  I will cotact [sic] the Fire Marshall and
> the Building Inspector, and I will ask Jackie for the SLA contact info.I just
> want to make sure this is ok with you before I do anything.  (2023 at A2884,
> A4943.)

Capece responded to this email, "10-4, good job.  If you need Special Patrols

let Lt. Sabella know how to make assignments, thanks…."  *Id.*  Hermann testified

that he named the other three establishments in the email (Roti, Golden Crest, and

Cahoots) because of violations at those establishments that came to his attention.

(2350 at A2969.)  He admitted he had no information about violations at Chrebet's

and gave as his only reasons for the visit the promoter he heard was there, though

he could not remember the promoter's name (2026 at A2885, 2350-2351 at

A2969), and "trying to find out who the manager was so that I could speak to that

person."  (2353 at A2970.)  He admitted, however, that by that time, three other

people—Pranzo, Feinberg, and Greene—had previously identified themselves to

him as manager.  (A2974, 2403-2404 at A2982-A2983, A5065.)  Hermann also

backtracked later to testify that Prince "played no role in my deciding to go

there"—only the promoter was a factor.  (2393 at A2980.)  Hermann also testified

that the first time he heard the name Matthew Prince was that day, March 3 (2027

at A2885, 2040-2041 at A2889), or the day before (2352 at A2970), from a former

member of the ESU working at Chrebet's named Mike (last name unknown).

(2028 at A2886, 2351 at A2969.)  He added he was just passing along what he was

told.  (2029 at A2886, 2035 at A2887.)

The raid followed March 8, 2008, at approximately 2:20 a.m., attended by

approximately eight or ten police officers, including Defendants-Appellees

Hermann and Arnold Rothenberg, plus Fire Marshals DeLuca and Szymanski, and

representatives of the SLA and Town of Hempstead Building Department.  (1053

at A2635, 2039 at A2888, 2373 at A2975, A3195, A4186-A4187, 4392-4393 at

A4339.40.)  As with the November 9 incident, Hermann's Form 44 report labeled

the visit a "routine inspection," but he admitted it was not given the other agencies

involved.  (2046-2047 at A2890, A5067.)  Rothenberg called the inspection

routine.  (A4339.48.)  Once again, Greene testified, Hermann asked for Prince and

proceeded to do a licensed premise check.  (1053 at A2635.)  Greene and Feinberg

both identified themselves to Hermann as managers.  (2404 at A2983.)  During the

check, Greene testified, Hermann walked upstairs, and Greene followed him,

asking him what he was doing there and saying

> there's financial information, money up here in the offices, there's no
> one up here. [Hermann] proceeded to run into one of the employees
> and he said where is Matt Prince? I instructed, he's not here, I told
> you he's no longer working here, I don't know what we're doing
> wrong, and asked him to leave and he went downstairs. (1053-1054 at
> A2635.)

The testimony of the other mentioned employee, Lynette Lucksavage,

corroborated Greene. (2296 at A2954.) Like Greene, and as Hermann admitted

(2043 at A2889), she informed the officer Prince was not there. (1054 at A2635,

1164-1165 at A2663.) According to Greene, Hermann added that if he found

Prince in the restaurant he would arrest him. (1163 at A2662.) Hermann denied

that he ever demanded to know where Prince was, but he admitted, "At some point

in time I did ask somebody if Matt was working." (2039-2040 at A2888-A2889,

2357 at A2971.) Rothenberg initially testified "I don't recall" whether there was

discussion of Prince (A4192), but later admitted Prince's name did come up—

specifically from Hermann according to his deposition testimony, though his

recollection was not that specific at trial. (4383 at A4339.38, 4402 at A4339.43.)

No summonses were issued that night. (2396 at A2981.) On March 14, 2008,

Hermann and other officers went outside the premises of Chrebet's and wrote

tickets for parking violations. (2048-2049 at A2891, 2362-2366 at A2972-A2973.)

### 3. The Police Instruct Chrebet, Sr., to Ban Prince from Chrebet's

On March 17, 2008, Wayne Chrebet, Sr. ("Chrebet, Sr."), who at the time was helping his son with the restaurant without pay (1227 at A2678, 1437 at A2735), and Chris Greene met at the First Precinct with Rothenberg and Fitzgerald. (560-561 at A2509-A2510, 1057 at A2636, A4196.) Fitzgerald admitted he took an interest in Chrebet's after hearing sergeants in the First Precinct discussing the establishment shortly after he joined the precinct and prior to Prince's arrest. (2417-2418 at A2986, 2421-2422 at A2987, 2428-2429 at A2989, 2527 at A3013). He knew of Prince as the manager, but said he did not recall how he learned that. (2555 at A3020.) From 1998-2005, he worked as a police liaison for the Nassau County grand jury and county court, where he coordinated officer appearances in grand jury proceedings. (A3043.)

The meeting was held in a small (approximately 15' x 15' (2445 at A2993)) office at the First Precinct known as the summons room. (2447 at A2993, A4193-A4194.) At the meeting, according to Greene and Chrebet, Sr., it was Rothenberg who first mentioned Prince's name, despite the fact that Rothenberg and Prince had no known prior interaction. (1141-1142 at A2657, 1407-1408 at A2728, 1426 at A2733, 1434-1435 at A2735.)[9] Both testified that Chrebet, Sr., asked what he

---

[9] In fact, Chrebet, Sr., did not know at the time that Prince was a problem (1428-1429 at A2733, 1436 at A2735) and was unaware of his son's relationship with Prince or the latter's lack of involvement with the establishment since July 2007. (1430 at A2734.)

needed to do for his son's establishment to be left alone given the raids, and Rothenberg replied he needed to keep Prince off the premises.  (1057 at A2636, 1141-1142 at A2657, 1407 at A2728.)  Chrebet, Sr., testified that he then advised Rothenberg that "Matt Prince isn't on the premises.  He doesn't have anything to do with Chrebet's."  (1407-1408 at A2728.)  Rothenberg replied, "well, we have information that he was sitting at the bar a couple of days ago."  (1408 at A2728.)  Chrebet, Sr., indicated he had been unaware of that, but added that "if that's what I need to do, Matt Prince…cannot be on the premises, then that's what I'll do."  (*Id.*)

Both Chrebet, Sr., and Greene testified as to what followed: Chrebet, Sr., asked how he could go about keeping Prince off the premises.  (1142 at A2657, 1408 at A2728.)  Rothenberg told him to write a letter stating that Prince was not to return to the premises or he would be arrested for trespassing.  (1043 at A2632, 1143 at A2657, 1153 at A2660, 1408 at A2728.)  Greene testified that the issues of underage drinking and overcrowding were not discussed at the meeting; Prince was the decisive reason for Chrebet's issues.  (1144 at A2658.)  Greene did not speak at all during the meeting.  (1143 at A2657.)

Following the meeting, Chrebet, Sr., called Prince to convey to him the meeting that had taken place and that Prince could not come to Chrebet's—a request with which Prince said he would comply "out of respect to you, sir."  (1409 at A2728.)  Chrebet, Sr., informed him of the letter that was on the way.  (506-510

55

at A2496-A2497.)  Before then, Prince had never heard either Chrebet, Sr., or

Chrebet, Jr., express a desire to have him stay off the Chrebet's property,

frustration about any difficulties in keeping him off the premises, or any indication

that failure to stay away would result in a criminal trespass charge.  (275-276 at

A2437.)  Chrebet, Sr., sent Prince by certified mail (506-507 at A2496) the

following letter, dated March 19, 2008, barring him from the premises:

> This letter is to confirm in writing our telephone conversation
> regarding our request that you do not trespass on the property of
> Chrebet's Restaurant and Lounge…at anytime.
> As you know and for reasons we discussed, it is unfortunate it has
> come to this, but due to the position of the authorities we have no
> alternative.
> It should also be known you have no business association with
> Chrebet's Inc, or [sic] are you involved in any of Chrebet's Inc,
> business operations.
> Therefore, it is understood if you violate this agreement we will be
> forced to call 911 and the Nassau County Police will be requested to
> arrest you for trespassing.  (A4945.)

When asked to explain the line "due to the position of the authorities we

have no alternative," Chrebet, Sr., testified he "felt bad," given all of Prince's work

to set up the restaurant, "that this was the way he was going to be treated," and

confirmed the "authorities" referred to the Nassau County Police Department.

(1413 at A2729.)

The two attending police officers' testimony regarding the March 17

meeting contradicted Chrebet, Sr., and Greene's account as well as each other's.

Rothenberg recalled that Chrebet, Sr., "ask[ed] how can I make" police visits to

56

Chrebet's "stop" (A4197, 4400 at A4339.42) and maintained that he brought up

notifying Prince to stay off the premises.  (4408-4410 at A4339.44-A4339.45.)  He

denied telling Chrebet, Sr., he should send Prince a letter and maintained Chrebet,

Sr., decided to do so on his own (4411 at A4339.45), though he admitted, "I said,

you can tell him to stay away….And if he is still there, you can call us."  (4419 at

A4339.47.)  Rothenberg maintained he "explained to [Chrebet, Sr.,] the concept of

trespassing in answer to his question."  (4410-4411 at A4339.45.)

Fitzgerald initially testified he did not "specifically" recall discussion of

Chrebet, Sr., regarding police activity at Chrebet's.  (2446 at A2993.)  He recalled

only discussion of parking restrictions, though he was "sure" without "recall[ing]

the exact contents" that another issue was discussed.  (2454 at A2995.)

Rothenberg, however, did not recall any discussion of parking issues.  (4400-4401

at A4339.42.)  Fitzgerald later testified, in contrast to his earlier statement about

his limited recollection, that he suggested Chrebet, Sr., remove the sentence about

having no alternative due to the position of the authorities.  (2457-2459 at A2996.)

He then recalled Prince's name came up without recalling who mentioned him.

(2462 at A2997.)  Still later, he said he only remembered parking enforcement and

an issue about liquor service coming up.  (2555-2556 at A3020-A3021.)

Rothenberg maintained that Chrebet, Sr., brought up Prince—specifically,

by saying "[h]e believed that Chrebet's was being targeted because of Matthew

Prince." (A4199.) Rothenberg maintained he had never met Prince prior to the meeting; knew "[v]aguely" who he was (*id.*); had never been to Bogart's (A4204); but understood from the supervisors at the First Precinct that Bogart's was a constant source of trouble to the precinct. (4406 at A4339.44.) He had heard Prince's name from supervisors from shortly after he joined the precinct in 2006. (4384 at A4339.38.) He had been to Chrebet's on November 9, 2007, and on February 24 and March 8, 2008. (A4339.36-A4339.37, 4389-4390 at A4339.39-A4339.40.)

In other testimony regarding the meeting, Fitzgerald initially stated he did not recall Chrebet, Sr., came to the meeting carrying anything in hand (2449-2452 at A2994-A2995), then maintained Chrebet, Sr., brought his letter to Prince with him (2454 at A2995), and later did not recall whether he arrived with something in his hand. (2464-2465 at A2998.) Rothenberg, however, testified he did not recall seeing a letter from Chrebet, Sr., to Prince at the meeting. (4414 at A4339.46.) (That is considerably divergent testimony for a meeting that occurred in a 15' x 15' office.) Rothenberg testified that he received a copy of the letter after it was sent; that he "discussed it with Lieutenant Fitzgerald, and later with Sergeant Herrmann, and then I filed it away." (A4201.) Fitzgerald, however, testified he did not recall discussing the letter with other members of the First Precinct. (2461 at A2997.) Although he testified he disagreed with the "due to the position of the authorities"

58

line, after receiving the letter, Rothenberg admitted he "didn't express any position" on the issue during the meeting, call Chrebet, Sr., or take any steps to correct the impression such a letter would have on Prince. (A4201-A4202, 4411 at A4339.45.) Neither did his testimony reflect that Fitzgerald addressed this issue with Chrebet, Sr. Rothenberg gave Fitzgerald a copy of the letter at some point afterwards. (4412 at A4339.45.)

Additionally, although he testified at his deposition that he had only one meeting with Chrebet, Sr., Fitzgerald retracted that testimony at trial and stated he had a second meeting with him the same week. (2455-2456 at A2995-A2996, 2460 at A2997.) Rothenberg testified Fitzgerald never indicated in their conversations that he had a second meeting with Chrebet, Sr. (4413-4414 at A4339.45-A4339.46.) Fitzgerald did not recall what was discussed at the alleged second meeting (2462-2463 at A2997) or whether Chrebet, Sr., appeared with a letter. (2466 at A2998.)

After Chrebet, Sr., sent Prince the letter, Chrebet's was subjected to no additional raids until it closed in the summer of 2008. (1059-1060 at A2636-A2637, 2049-2050 at A2891.) In contrast to earlier, an April 2008 call to report a fight involving patrons at Chrebet's was met by approximately three police cars (1414-1415 at A2730) and a prompt and courteous walk-through by police. (1415-1416 at A2730.)

59

### 4. Chris Greene's Fear of Similar Retaliation Precluded at Trial

Greene stopped working at Chrebet's soon after the First Precinct meeting because, he testified, "I couldn't at that point jeopardize my teaching license." (1059 at A2636.)  He did not report to any law enforcement agency any of the events he testified to regarding Hermann.  (1154 at A2660.)  Defendants' counsel objected to the question Plaintiff's counsel posed as to why he did not make such a report.  (*Id.*)  Out of the presence of the jury, Greene replied,

> First reason I didn't report it, I was very nervous about what could happen to myself, what could happen to my career, what could happen to the job I had, what could happen to people that were employed there.  I saw what happened to Matt Prince along the lines, with his family and his home and his well-being, and honestly I was really concerned about what could happen to me.  They were saying where is Matt Prince.  I was really concerned they were going to say where is Chris Green[e] coming up next, and I had a wife and family….When you have municipalities of whole different sorts asking where is Matt Prince, where is Matt Prince, and you're getting tickets and people are getting arrested you're afraid the next person on the list was going to be, and I was very fearful that that was going to come up.  (1158-1159 at A2661.)

Greene added the landlord of the property "wanted to call News 12," but Greene explained to him the situation, "and he was scared also" of "what could happen."  (1159 at A2661.)   The court precluded this testimony, citing Rule 403.  (A2662.)

### *Prince is Severely Injured by Defendants' Conduct*

Prince "in essence…got blackballed from [the bar/restaurant] industry."

(542-543 at A2505.)  Indeed, he does not feel he could run any business in Nassau County.[10]  (559 at A2509.)  Besides this direct damage to his ability to make a living, the foregoing events took a great personal toll, including the loss of his marriage, his children, and his house.  (279 at A2438.)  From the time Prince and his ex-wife, Meredith Schechter ("Meredith"), met through 2002, she described him as "outgoing, fun," "mellow," exhibiting no stress or anxiety, and she added, "We had a normal life, fine, no problems."  (1452-1454 at A2739-A2740.)

After January 2003, however, he changed in ways that "hurt our marriage," becoming "very stressed, very hard to be around," and "struggling for his family." (1455-1456 at A2740.)  Dr. Michael Lowenthal, a general internist who treated Prince, testified to several stress-related symptoms Prince exhibited during visits since 2003, including gastrointestinal problems, chest pain, heightened anxiety, inability to sleep, and panic attacks.  (1773-1777 at A2820-A2821, 1784 at A2823).  The "stress from his work situation," Lowenthal concluded, "was…bubbling over into other parts of his life" (1870 at A2845) and required a Xanax prescription.  (A2822, 1783 at A2823.)

Dr. Jeffrey Kassinove, a psychologist who treated Prince, concurred.  (2109 at A2907.)  He concluded Prince "was clearly exhibiting significant levels of

---

[10] In 2011, Prince made a foray into self-serve ice cream stores, opening locations outside Nassau County, because, he testified, "I didn't feel like I could run a business in the county knowing the hatred the police and fire marshals have for me."  (559 at A2509.)

anxiety as well as depression" based on the harassment following his 2003 grand jury testimony.  (2105-2108 at A2906-A2907.)  That was "the primary cause for his downfall."  (2258-2260 at A2945.)  Mark Lerner, the psychologist who testified for the defense, concluded Prince "was experiencing emotional distress" and opined that some of his responses reflected distortion or exaggeration (A3436), though not Prince's allegations about Collins' threats and the increased police presence that followed.  (A3515-A3517.)

Meredith described Prince as "a ball of stress" as a result of losing his job in 2003 and the end of 2005 (564 at A2510), and it was "unbearable" for her to "be around him anymore" after Chrebet's grand opening exacerbated the stress.  (1460-1461 at A2741.)  They divorced in August 2007, one month after Prince's consulting agreement was terminated.  (278-279 at A2437-A2438.)  The testimony of Prince, his ex-wife, and Dr. Kassinove attributed the breakdown of their marriage to the effects of police harassment.  (*id.*, A2502, 2185 at A2926, 2203 at A2931, 2248 at A2942, 2276 at A2949.)

Although, in an unrelated incident in the spring of 2006, Prince was arrested in New York City during random pullovers on a DUI charge and was briefly in custody, he and Meredith testified that incident had no effect on their relationship (284 at A2439, 527-528 at A2501, 1464 at A2742), and Dr. Kassinove did not

62

"think that was an issue." (2113 at A2908.)[11] Dr. Lowenthal concurred (1871 at A2845) and similarly attributed Prince's medical problems to "his inability to work" and the strain of his divorce. (1787-1788 at A2824.) Prince's anxiety is "through the roof" as he cannot sleep and has "cried nightly about my wife and children not living under my roof." (A2438, 537 at A2504.) His wife remarried and was pregnant at trial. (552 at A2507.) Meredith testified Prince is "[n]othing like the man that I married"—that he "got his life taken away from him." (1466 at A2743.) These were the effects, Prince testified, of doing "the right thing," *i.e.*, "I went to the grand jury hearing and I testified against a policeman." (279-280 at A2438, 555 at A2508.)

### *Hurricane Sandy and the Unexpected Length of the Trial Raise Jury Concerns*

As early as October 3, 2012, Judge Hurley noted that "[t]he jury has indicated that they're very concerned about the length of the case." (1750 at A2815.) Later that day, the judge also responded at the prospect of a long cross-examination, "I'm…afraid we're going to lose this jury at the rate we're going" (1770 at A2820)—a fear he would reiterate. (A3584.) Additionally, throughout the trial, Judge Hurley repeatedly acknowledged potential juror confusion. He

---

[11] They also ruled out other factors, such as a disagreement with Prince's parents on getting proceeds of the sale of the New York City Bogart's. (551-552 at A2507, 556-557 at A2508-A2509, A2543, 1478 at A2746, 2257-2258 at A2944-A2945.)

found that "this case is very confusing because there are so many episodes with so many individuals." (1377 at A2717.) On October 16, he said, "I feel very bad for this jury." (A3406.) The next day, he said "[we] buried [the jury] over the past months" (A3584) and "[t]his case is so convoluted and so long." (A3586.) Jurors were initially told the end of October was the "worst case scenario" of their expected time commitment (A4055), and Judge Hurley would acknowledge they went considerably beyond that commitment. (A4783.)

The record reflects no steps taken by the district court to ensure that the effects of Hurricane Sandy did not prevent the jurors from discharging their duties, even though the record includes passing acknowledgement of the catastrophe that befell the region. (*See, e.g.,* A4487 ("I know it's been difficult for you to get here. I don't even want to discuss gas lines, et cetera, but you're all to be commended."); A4721 ("people having problems getting to Court, gas shortages, another NorEaster on the way"); A4873 ("Certainly jurors were carpooling and abandoned that process because of the absence of gas.")) During their deliberations, which began November 6, 13 days after the close of evidence, the jury requested seventeen read backs of testimony. (A5095-A5096, A5098-A5103, A5108-A5109.) During the read backs, Judge Hurley remarked, "I feel so terrible for this jury. I never had a case where we had so many problems with read backs and I have been doing this for 30 years now. It's like endless." (A4774.)

### *Jury Deadlock on the Intentional Infliction of Emotional Distress*

The district court's November 6 jury charge on Prince's claim for the intentional infliction of emotional distress stated:

> One who intentionally and for the purpose of causing severe emotional distress conducts himself towards another person in a manner so shocking and outrageous that it exceeds all reasonable bounds of decency, is liable to such person for any resulting severe emotional distress.
> Intent involves a state of mind for which an act is done. If a person acts voluntarily with a desire to bring about a result, he is said to have intended that result.
> Further, although he has no desire to bring about the result, if he does the act knowing with substantial certainty that the results will follow, he is also said to have intended that result.
> Emotional distress is severe when it is of such intensity and duration that no reasonable person should be expected to endure it. (A4702-A4703.)

During deliberations, at approximately 3:50 p.m. on November 14, the jury sent the following note regarding Prince's intentional infliction of emotional distress claim: "We are at an impasse regarding the elements of emotional distress; can the court provide more clarification to help us….Please provide examples of outrageous & shocking." (A5104.) Approximately fifty minutes later, another note—"*Third Cause of Action*"—emphasized the jurors' concern over that issue. (A5105.) In response, on November 15, the district court stated, "We are not in a position to give examples" (A4902) and read the jury the following language from *Freihofer v. Hertz Corp.*, 65 N.Y.2d 135, 143 (1985): "The tort of intentional infliction of emotional distress predicates liability on the basis of extreme and

65

outrageous conduct, which so transcends the bounds of decency as to be regarded as atrocious and intolerable in a civilized society." (A4903.) The court admitted this was "basically a restatement" of what the jury "have already been told with respect to this item." (A4904.)

The court denied Prince's counsel's request (A4888, A4899-A4902) to respond to the jury with the following charges drawn from numerous New York decisions restated in § 3:6 of the Pattern Jury Instructions: "More must be involved than hurt feelings; mere insults, indignities, threats, annoyances or other trivialities are not enough" (citations omitted); "a deliberate and malicious campaign of harassment or intimidation gives rise to a cause of action" (citing, *inter alia*, *Nader v. General Motors Corp.*, 25 N.Y.2d 560 (1970)); and "The extreme and outrageous nature of the conduct may arise from abuse by the defendant of some relation or position that gives the defendant actual or apparent power to damage the plaintiff's interests" (citing *Vasarhelyi v. New School for Social Research*, 230 A.D.2d 658 (1st Dep't 1996); Prosser & Keeton, Torts § 12 (5th ed.)).

At 1:30 p.m. on Thursday, November 15, the jury followed up with the following note: "We are extremely deadlocked on the intentional infliction of emotional distress claim against all defendants." (A5106.) Judge Hurley reiterated, "I feel badly for the jury for a number of reasons" (A4910-A4911), but since the jury had not "been laboring at this item for that long," the judge

66

responded simply by delivering the jury an *Allen* charge. (A4912-A4915.)

Although they had deliberated that week for about two and a half days, the jurors

asked to go home at 3:35 p.m., approximately an hour and 10 minutes after being

read the *Allen* charge, and to reconvene the following Monday. (A4916-A4918,

A5107.) On Monday the 19th, the jury resumed their deliberations at 10:02 a.m.

(A4924.) At approximately 10:40 a.m., they sent the first of two notes that day

with questions pertaining to Prince's state of mind. (A5108.) Also on November

19, a juror's dismissal reduced the jury to its minimum number of seven. (A4923-

A4924.) The jury reached their verdict against Prince the next day, November 20,

at approximately 12:05 p.m. (A5110.)


## SUMMARY OF ARGUMENT

I. In dismissing Prince's 42 U.S.C. § 1983 municipal liability claims against

Nassau County, the district court disregarded the overwhelming weight of case

law, which establishes numerous grounds for establishing municipal liability—

including in cases where custom or practice is established amid a pattern of

misconduct with constructive notice and absent affirmative acts by policymakers.

Instead, the district court apparently held that plaintiffs cannot allege municipal

liability under § 1983 based on conduct unique to them, but that is erroneous as a

matter of both logic and ample case law. Additionally, testimony offered

substantial evidence of animus that so permeated the ranks of law enforcement, including senior personnel and many officers in a police precinct with only 15 patrol sergeants, that it defies credulity to preclude a finding of municipal liability. Wherever the conduct of Nassau County officials falls on the spectrum of liability from constructive notice to actual notice to actual participation by policymakers, it is clear that a reasonable jury could decide it fell within that spectrum.

II. The district court erroneously required as a prerequisite to demonstrating First Amendment retaliation the chilling of the plaintiff's speech where a private citizen sues government officials. In fact, as was explained in *Gill v. Pidlypchak*, 389 F.3d 379 (2d Cir. 2004), and held in numerous cases in this Circuit, chilling is required where a plaintiff states no harm independent of the chilling of speech, but where retaliation is alleged to cause injuries other than chilling, including job loss, the "chilling" element is not necessary to state a claim. Prince clearly alleged injuries other than chilling—most conspicuously job loss—and the decision below should be reversed on that ground alone. Even apart from that point, the evidence does reveal a chilling effect upon Prince resulting from police misconduct.

III. The district court's response to jury questions regarding the intentional infliction of emotional distress failed to correct jury confusion. Jurors sent several notes to the court conveying its inability to decide that claim, including the request to "provide examples of outrageous & shocking." The court declined to do so,

68

instead providing a virtual repetition of its earlier stated language. It should have added language from the Pattern Jury Instructions supplying from well established case law the example of "a deliberate and malicious campaign of harassment or intimidation." The absence of that or similar clarification in the context of the jurors' indication they were "extremely deadlocked" constitutes reversible error.

IV. There was a thirteen-day gap between the close of evidence and the start of jury deliberations brought on primarily by the effects of Hurricane Sandy, plus an additional five-day gap that occurred early during jury deliberations. When such delays are brought on by disruptive events, jurors' recollection of evidence can be expected to diminish by the phenomenon known as "retroactive interference." The trial record reflects this—from the seventeen read backs that the jury requested during deliberations to numerous statements by the judge that reflected doubt as to the jury's ability to discharge its duty. Combined with other factors, including delays well beyond the maximum time commitment jurors were initially told to expect, the probability of prejudice is great enough to demonstrate the denial of due process. The failure to take any remedial action raises sufficient due process concerns that the case should be remanded for a new trial.

V. The district court erroneously precluded Chris Greene's testimony detailing his fear of retaliation based on his firsthand observations. Such testimony offered a basis for the most critical issues of this case and provided strong external

69

validation of harassment as the cause of Prince's injuries. In a case where Greene worked with Prince longer than any other witness and where Defendants were attempting to undermine Prince's credibility, the error was not harmless.

## ARGUMENT

### POINT I

### THE DISTRICT COURT ERRED IN DISMISSING PRINCE'S 42 U.S.C. § 1983 MUNICIPAL LIABILITY CLAIMS AGAINST NASSAU COUNTY

#### A. There Are Numerous Grounds for § 1983 Municipal Liability

Prince was run out of three businesses and blackballed from the restaurant and bar industry in Nassau County at the hands of the Nassau County Police Department and Fire Marshal's Office, which engaged in a persistent, pervasive practice of harassment clearly sufficient to create a jury question as to Nassau County's municipal liability. In *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 694 (1978), the Supreme Court held that "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury,…the government as an entity is responsible under § 1983." This issue is subject to *de novo* review. *See Hasan v. Holder*, No. 11-3381, 2013 U.S. App. LEXIS 8841, *2 (2d Cir. May 1, 2013); *Rubens v. Mason*, 527 F.3d 252, 254 (2d Cir. 2008).

"Later cases have considerably broadened the concept of official municipal

70

action." *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 125 (2d Cir. 2004) (Sotomayor, J.). There are several ways in which § 1983 municipal liability can be established even absent "formal approval through the body's official decisionmaking channels." *Monell*, *supra*, 436 U.S. at 691. Some cases look to acts or decisions of "the highest officials responsible for setting policy in that area of the government's business," *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (plurality), with "particular officers" having "authority to establish binding county policy respecting particular matters" depending on the circumstances. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). A single act by such an official can be enough to establish municipal liability under appropriate circumstances. *Id.* at 480.

In other cases, municipal liability attaches to "a 'custom, or usage, of [a] State,'" which "must have the force of law by virtue of the persistent practices of state officials." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167 (1970), *cited in Connick v. Thompson*, __U.S.__, 131 S.Ct. 1350, 1359 (2011). "[U]nlike a policy, which comes into existence because of the top-down affirmative decision of a policymaker, a custom develops from the bottom-up." *Baron v. Suffolk County Sheriff's Dep't*, 402 F.2d 225, 236 (1st Cir. 2005) (citations and internal quotation marks omitted).

Case law makes clear that § 1983 municipal liability can be found in the

71

absence of any actions by policymakers.  In *Canton v. Harris*, 489 U.S. 378

(1989), the Supreme Court based municipal liability on the failure to train

members of its police force.  The Court identified two different approaches to find

such failure.  First, the need to take some action to control agents of the

government may be "so obvious, and the inadequacy [of existing practice] so likely

to result in the violation of constitutional rights, that the policymakers…can

reasonably be said to have been deliberately indifferent to the need."  *Id.* at 390

n.10 (citation and internal quotation marks omitted).  Second, a municipality may

be held responsible where the frequency of constitutional violations is such "that

the need for further training must have been plainly obvious to the…policymakers,

who, nevertheless, are 'deliberately indifferent' to the need."  *Id.*  Likewise, under

a similar analysis, a municipality's failure to supervise or discipline its officers can

amount to an actionable policy or custom.  *Turpin v. Mailet*, 619 F.2d 196, 201 (2d

Cir.), *cert. denied*, *Turpin v. West Haven*, 449 U.S. 1016 (1980); *Anilao v. Spota*,

774 F. Supp.2d 457, 495 (E.D.N.Y. 2011).

Accordingly, while actual notice to policymakers can be a predicate for §

1983 municipal liability, it is also sufficient to show misconduct "so manifest as to

imply the constructive acquiescence of senior policy-making officials," *Sorlucco v.*

*New York City Police Dep't*, 971 F.2d 864, 871 (2d Cir. 1992), and "[w]e must be

careful…not to conflate the concepts of constructive and actual

notice….[C]onstructive knowledge inquires into what the [municipality], in the exercise of reasonable care, *should have known*. It would be absurd to allow an employer to insulate itself from liability simply by isolating its units from management." *Sharp v. City of Houston*, 164 F.3d 923, 931 (5th Cir. 1999).

"A persistent practice may constitute municipal policy whether it is carried out by the policymakers themselves, by other high-ranking officials, or even by subordinate employees." *Sorlucco*, 971 F.2d at 871 (quoting 1 M. Schwartz & J. Kirklin, *Section 1983 Litigation,* § 7.8, at 364 (2d ed. 1991)). There is a voluminous body of decisions that rest municipal liability on a custom or practice absent affirmative acts by policymakers where there is a pattern of misconduct or persistent practice by other municipal employees. *See, e.g.*, *Canton*, *supra*; *Doe v. Gay*, 719 F.3d 679, 686-687 (8th Cir. 2013) (sexual assault); *Okin v. Village of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 440 (2d Cir. 2009) (pattern of failure by police to respond to complaints); *Baron*, *supra*, 402 F.2d 239, 242 (retaliatory harassment of corrections officer who was forced to quit); *Milam v. City of San Antonio*, 113 Fed. Appx. 622, 628 (5th Cir. 2004) ("the failure to take disciplinary action in response to an illegal arrest, when combined with other evidence, could tend to support an inference that there was a preexisting de facto policy[12] of making illegal arrests"); *Woodward v. Correctional Medical Services*,

---

[12] The district court held that "you can[not] have a de facto policy maker" (A4393), but *de facto*

368 F.3d 917, 927 (7th Cir. 2004) (inadequate treatment of mentally ill inmates); *Daskalea v. District of Columbia*, 227 F.3d 433, 441-42 (D.C. Cir. 2000) (sexual abuse of inmates); *Blair v. Pomona*, 223 F.3d 1074, 1080, 1081 (9th Cir. 2000) (retaliation for reporting misconduct); *Jeffes v. Barnes*, 208 F.3d 49, 63 (2d Cir. 2000) (same); *Sharp*, *supra*, 164 F.3d at 930 ("open and pervasive" sexual harassment); *Kneipp v. Tedder*, 95 F.3d 1199, 1212-13 (3d Cir. 1996) (state-created danger); *Vann v. City of New York*, 72 F.3d 1040, 1049-51 (2d Cir. 1995) (excessive force by officer with history of abusive conduct); *Walker v. City of New York*, 974 F.2d 293, 301 (2d Cir. 1992) ("pattern of misconduct" such as police perjury and cover-up may be "sufficient to turn…reasonable reliance into deliberate indifference"); *Sorlucco*, *supra*, 971 F.2d at 871 (termination of police officer who alleged rape by another officer); *Gentile v. County of Suffolk*, 926 F.2d 142, 152-53 (2d Cir. 1991) (police and prosecutorial misconduct); *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987) ("duration and frequency of the [police] practices warrants a finding of either actual or constructive knowledge"); *Powe v. City of Chicago*, 664 F.2d 639, 650-51 (7th Cir. 1981) (pattern of four unlawful arrests); *Owens v. Haas*, 601 F.2d 1242, 1246-47 (2d Cir.) (police beating of inmate), *cert. denied sub nom. County of Nassau v. Owens*, 444 U.S. 980 (1979); *Bertuglia v. City of New York*, 839 F. Supp.2d 703, 737-738 (S.D.N.Y.

policy is another matter.

2012) (prosecutorial misconduct); *Shanks v. Village of Catskill Board of Trustees*, 653 F. Supp.2d 158, 171 (N.D.N.Y. 2009) ("constructive knowledge of" pervasive, retaliatory threats and harassment "can be implied on the part of municipal policymaking officials"); *Crippen v. Town of Hempstead*, No. 07-CV-3478 (JFB), 2009 U.S. Dist. LEXIS 24820, **40-42 (E.D.N.Y. Mar. 25, 2009) (harassment by town officials); *Bissinger v. City of New York*, No. 06 Civ. 2325 (WHP), 2007 U.S. Dist. LEXIS 70155, *9 (S.D.N.Y. Sept. 24, 2007) (alleging "multiple incidents of wrongful police conduct…is sufficient to raise an inference of a municipal policy or custom"); *Brown v. City of Margate*, 842 F. Supp. 515, 518-19 (S.D. Fla. 1993) (three incidents of excessive force), *aff'd*, 56 F.3d 1390 (11th Cir. 1995); *Sango v. City of New York*, No. 83 CV 5177 (JMM), 1989 U.S. Dist. LEXIS 18214, *22 (E.D.N.Y. June 19, 1989) ("pattern of constitutional violations" by police); *Redmond v. Baxley*, 475 F. Supp. 1111, 1117 (E.D. Mich. 1979) ("pervasive prison violence").

Far from being exceptional, § 1983 plaintiffs usually "allege constitutional deprivations at the hands of the lower-level municipal employees to whom some authority has been delegated, rather than at the hands of those officials with final policymaking authority." *Amnesty America*, *supra*, 361 F.3d at 126. "The usual way in which an unconstitutional policy is inferred, in the absence of direct evidence, is by showing a series of bad acts and inviting the court to infer from

them that the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate officers." *Jackson v. Marion County*, 66 F.3d 151, 152 (7th Cir. 1995) (Posner, J.). The district court failed to consider the full consequences of the wide array of bad acts that occurred in the instant case.

### B. The District Court Erroneously Foreclosed Several Theories of Liability That Do Not Depend on Acts by Policymakers

Before looking specifically at the acts or omissions of policymakers, it is clear that testimony places the instant case among those in which a jury could easily find a custom or practice independent of whether there were any affirmative acts by policymakers. We look at the evidence in a light favorable to Prince, which requires no stretch of the imagination when we consider the dizzying multiplicity of contradictions in the testimony of police officers and fire marshals in their attempts to deny their obvious misconduct. Prince underwent years of harassment at the hands of Nassau County police officers and fire marshals, traceable to some degree to his family's largely ignored IAU complaint,[13] but for the most part to retaliation for his 2003 grand jury testimony. One does not have to rely on circumstantial evidence, as is often necessary in such cases, to discern the

---

[13] The "absence of evidence that…complaints were investigated could lead a reasonable jury to infer deliberate indifference." *Davis v. Lynbrook*, 224 F. Supp.2d 463, 479-80 (E.D.N.Y. 2002).

nature of the misconduct. It was explicit. This was clear from the moment Officer Collins told Prince he would put him out of his life for his testimony. The harassment that followed was not limited to Collins, but quickly extended to other officers in the First Precinct. Sergeant Nesbitt and other officers were also explicit in telling Prince repeatedly in 2003 that "that's what happens when you testify against the police."

The harassment was limited neither by the number of law enforcement officials involved, which quickly came to include fire marshals, nor by time period. Prince's parents, who had owned Bogart's for nine years, were forced to sell the establishment six months after their son's grand jury testimony. The Dobins were forced to close less than ten months after law enforcement became aware of Prince's involvement. Chrebet, Jr., was stymied in his business from his grand opening until the respite that followed his termination of Prince, and even that respite ceased after police came to believe (however incorrectly) that Prince was still involved with his restaurant.

Over a period of more than five years, the personnel involved changed, but the harassment persisted. This includes post-termination harassment in 2007-2008 and Prince's "banishment" from Chrebet's, which the district court should have considered as compelling post-event evidence suggesting a municipal custom. *See Collins v. City of New York*, No. 11-CV-766 (FB)(RML), 2013 U.S. Dist. LEXIS

21199, **34-35 (E.D.N.Y. Feb. 15, 2013) (citing *Henry v. County of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997), *amended on denial of reh'g*, 137 F3d 1372 (9th Cir 1998); *Bordanaro v. McLeod*, 871 F.2d 1151, 1167 (1st Cir.), *cert. denied*, 493 U.S. 820 (1989); *Grandstaff v. City of Borger*, 767 F.2d 161, 170 (5th Cir. 1985), *cert. denied*, 480 U.S. 916 (1987)).  Police officers Soto, Hermann, Lowry, Rothenberg, and Fitzgerald did not work in the First Precinct at the time of the Fama beating, yet Soto and Hermann would come to Chrebet's persistently asking for Prince; Soto would arrest him, expressing pleasure at doing so, on a baseless charge; Lowry would tell Chrebet, Jr., that terminating Prince was the right choice; and Rothenberg would tell Chrebet, Sr., in Fitzgerald's presence, to banish Prince from the premises entirely, on pain of arrest, if he wanted the restaurant left alone. Fire Marshals Tusa and Krummenacker were not new to the area, and testimony reflects little about their role in 2003 (beyond the baseless overcrowding summons Krummenacker wrote Prince).  Nonetheless, Tusa was among those entering the premises and asking for Prince, and Krummenacker told Chrebet, Jr., to fire him. No one who worked with Prince ever expressed any reason other than the directives of law enforcement for his termination or for keeping him away on pain of arrest.

Evidence reveals a situation starkly different from isolated events involving one or two subordinate officers like Collins.  His personal retaliation quickly

78

became institutional retaliation—an ingrained practice targeting Prince no matter

how much time elapsed and personnel changed between 2003 and 2008.  This is

illustrated by the following chart that reflects much of the institutional animus

against Prince drawn from testimony:

| Testimony reflecting officials' knowledge and animus re: Prince, 2003-2008[14] | | | | |
| --- | --- | --- | --- | --- |
| (* denotes those who had never met Prince as of 2003) | | | | |
| Name of Official | 2003 | 2005 | 2007 | 2008 |
| P.O. Michael Collins | Threatened Prince regarding grand jury testimony: "I'm going to take you out of your F'ing life for what you said in there." | | | |
| | Participated in heightened police activity | | | |
| Sgt. Ronald Nesbitt | Participated in heightened police activity; told Prince "this is what happens when you testify against | | | |

---

[14] During 2004, Bogart's was being renovated part of the year, and officials were unaware of Prince's involvement under the new ownership until March 2005.  In 2006, the establishment was closed and/or being renovated most of the year.  Thus, this chart does not include 2004 and 2006.

79

| Testimony reflecting officials' knowledge and animus re: Prince, 2003-2008[14] | | | | |
|---|---|---|---|---|
| (* denotes those who had never met Prince as of 2003) | | | | |
| **Name of Official** | **2003** | **2005** | **2007** | **2008** |
| | the police." | | | |
| Other police officers (2003) | Participated in heightened activity; told Prince, "that's what happens when you testify against the police." | | | |
| F.M. Michael Krummenacker | Wrote Prince summons for overcrowding despite presence of only 221 patrons | | Told Chrebet, Jr., 6/27/2007 he would continue having problems with law enforcement raids until he severed ties with Prince | |
| F.M. Scott Tusa* | Knew of Prince, was told by F.M. DeLuca that Prince attended 3/2005 meeting | | Repeatedly asked for Prince at 6/14-15/2007 raid | |
| | | Took part in subsequent 2005 raids, during which police and/or fire marshals frequently asked for Prince | Participated in 11/10/2007 raid | |

| Testimony reflecting officials' knowledge and animus re: Prince, 2003-2008[14] | | | | |
|---|---|---|---|---|
| (* denotes those who had never met Prince as of 2003) | | | | |
| Name of Official | 2003 | 2005 | 2007 | 2008 |
| F.M. Mark DeLuca | | Told F.M. Tusa Prince attended 3/2005 meeting | Possibly told F.M. Krummenacker Prince was terminated following 6/27/2007 meeting | Participated in 3/8/2008 multi-departmental raid |
| P.O. Richard Soto* | | | Asked for Prince during both 6/14-15/2007 and 6/22/2007 raids | |
| | | | Arrested Prince 6/22/2007 on erroneously issued bench warrant, calling it his "lucky day" and telling Prince "I'm going to be your new Sergeant Scalone" | |
| F.M. Paul Szymanski* | | | Knew of Prince from others in marshal's office prior to 6/14-15/2007 raid, in which he participated | Participated in 3/8/2008 multi-departmental raid |
| Deputy Chief Kevin Lowry* | | | Told Chrebet, Jr., 6/27/2007 firing Prince was the right choice | |
| | | | Asked Deputy | |

| Testimony reflecting officials' knowledge and animus re: Prince, 2003-2008[14] | | | | |
|---|---|---|---|---|
| (* denotes those who had never met Prince as of 2003) | | | | |
| **Name of Official** | **2003** | **2005** | **2007** | **2008** |
| | | | Chief O'Connor and C.O. Studdert following Prince's termination to show Chrebet's discretion | |
| Deputy Chief Patrick O'Connor | | | Asked by Deputy Chief Lowry following Prince's termination to show discretion to Chrebet's, which followed accordingly | |
| Commanding Officer Mike Studdert* | | | Asked by Deputy Chief Lowry following Prince's termination to show discretion to Chrebet's, which followed accordingly | |
| County Executive Tom Suozzi* | | | After being told Chrebet, Jr., "had done the right thing" and that Prince was being terminated, replied "he was aware of that" | |
| Sgt. Richard Hermann* | | | Repeatedly asked for Prince after | Sent C.O. Capece |

| Testimony reflecting officials' knowledge and animus re: Prince, 2003-2008[14] | | | | |
| --- | --- | --- | --- | --- |
| (* denotes those who had never met Prince as of 2003) | | | | |
| Name of Official | 2003 | 2005 | 2007 | 2008 |
| | | | arriving at Chrebet's 11/9/2007 | 3/8/2008 email proposing multi-departmental raid of several establishments, including Chrebet's, mentioning Prince (and no one else) by name |
| | | | Emailed all officers in precinct 11/9/2007, notifying them of zero tolerance approach to Chrebet's because employees did not cooperate in telling him who was in charge | Repeatedly asked for Prince in 3/8/2008 raid, went upstairs looking for him |
| | | | Asked for Prince when conducting 11/10/2007 multi-departmental raid, responding to 2/1/2008 call, and on other occasions visiting Chrebet's | |
| Commanding Officer John Capece* | | | | Responded to Hermann's 3/8/2008 email mentioning Prince, "10-4, good job" |

| Testimony reflecting officials' knowledge and animus re: Prince, 2003-2008[14] | | | | |
| --- | --- | --- | --- | --- |
| (* denotes those who had never met Prince as of 2003) | | | | |
| **Name of Official** | **2003** | **2005** | **2007** | **2008** |
| Sgt. Arnold Rothenberg* | | | Heard of Prince from discussion in precinct soon after joining in 2006 | Participated in 11/9/2007 and 2/24 and 3/8/2008 raids |
| | | | | Learned Prince was sitting at the bar at Chrebet's shortly before 3/17/2008 meeting |
| | | | | At 3/17/2008 meeting, told Chrebet, Sr., that for Chrebet's to be left alone, he would have to keep Prince off the premises; instructed him how to write a letter to that effect |
| Lieut. Brian Fitzgerald* | Worked 1998-2005 as police liaison for the county court and grand jury; coordinated officer appearances in grand jury proceedings | | Admitted he took an interest in Chrebet's after hearing sergeants discussing it shortly after he joined the precinct and knew of Prince | Attended 3/17/2008 meeting where Rothenberg told Chrebet, Sr., that for Chrebet's to be left alone, he would have to keep Prince off the premises |

84

Indeed, Nassau County's municipal liability is the logical premise of the individual liability of Defendants Soto and Tusa for Prince's termination under § 1983, and it makes little sense to have the jury consider their misconduct without letting it consider the *pattern* of conduct that began in 2002-2003 of which they played a part in its more recent phase.[15]  One reason the district court properly presented the jury the question of Soto's and Tusa's individual liability was the logical conclusion from the evidence that the ranks of law enforcement were permeated with an unconstitutional animus against Prince.  So many different actors previously unconnected with Bogart's lashed out at Prince with the consistency one would expect if there were (to use *Monell*'s term) an "edict" issued to police officers and fire marshals servicing the area.  To suggest such animus could permeate the ranks of law enforcement, including a substantial number of officers in a police precinct with only 15 patrol sergeants, not to mention senior personnel like Lowry, Krummenacker, and Tusa, while the "policymaker" in charge of the precinct remained blissfully oblivious to this, defies credulity.  Of course, to close Nassau County's "corporate eyes," *Sharp, supra*, 164 F.3d at 930, would not change the conclusion that the municipal policymaker

---

[15] That jurors were deadlocked on the issue of intentional infliction of emotional distress, *see* Point III *infra*, suggests not only that jurors may well have been inclined to find such liability based on some actors' conduct, but also that, given the higher standard of culpability required for the intentional infliction of emotional distress, they may have considered the county liable as well under § 1983 if they had a chance to consider such liability beyond Soto and Tusa.

should have known of this pervasive misconduct and at a minimum had constructive notice of it.

The district court's sole basis for rejecting *Monell* liability based on this theory is that the evidence of harassment presented pertained only to Bogart's and Chrebet's and not "other bars or restaurants within the relevant area." (A2175.) The court rested its conclusion on language from two decisions from the Southern District of New York: *McLaurin v. New Rochelle Police Officers*, 373 F. Supp.2d 385, 401 (S.D.N.Y. 2005) ("[O]ne man's experience does not make a policy."), *aff'd in part, vacated on other grounds*, 2007 U.S. App. LEXIS 1839 (2d Cir. Jan. 25, 2007), and *Birmingham v. Ogden,* 70 F. Supp. 2d 353, 373 (S.D.N.Y. 1999) ("the only fair inference here is that what happened to plaintiff…was unique to him—a deeply personal vendetta carried out by persons who were out to get him").

Both cases are inapposite. Among other issues, each of those cases involved only one (*Birmingham*) or two (*McLaurin*) incidents, and neither alleged involvement of any policymakers. They fall into the category of cases that are governed by *Pembaur*, *supra*, where the Supreme Court established the standard for municipal liability where only a single incident was involved; that is a difficult standard to meet absent affirmative acts by policymakers.[16] *See* 475 U.S. at 481.

---

[16] There is nonetheless authority that such liability can arise in single-incident cases. *See Sorlucco*, *supra*, 971 F.2d at 873 ("a single, usually brutal or egregious beating administered by a group of municipal employees may be sufficiently out of the ordinary to warrant an inference that it was attributable to inadequate training or supervision.") (quoting *Turpin*, *supra*, 619 F.2d

As has been discussed, there are many alternative theories to establish *Monell* liability, and it makes no sense to dismiss those theories that are based upon a pattern of conduct, which this case invokes, under the standard applicable to single-incident claims, which are clearly not involved here.

The remaining inference from the district court's decision, that plaintiffs cannot allege *Monell* liability based on conduct unique to them, is erroneous as a matter of both logic and ample case law in which such liability has been found for alleged conduct unique to the respective plaintiffs. *See Okin*, *supra*, 577 F.3d at 440; *Amnesty America*, *supra*, 361 F.3d at 128-29; *Blair*, *supra*, 223 F.3d at 1079-80, *Sharp*, *supra*, at 930; *Powe*, *supra*, 664 F.2d at 651-52; *Owens*, *supra*, 601 F.2d at 1246-47; *Shanks*, *supra*, 653 F. Supp.2d at 170-71; *Crippen*, *supra*, 2009 U.S. Dist. LEXIS 24820, at **40-42; *Bissinger*, 2007 U.S. Dist. LEXIS 70155, at *9. Discussing its prior *Birmingham* decision, the Southern District of New York also rejected that proposition in *Kempkes v. Downey*, No. 07-CV-1298 (KMK)(GAY), 2008 U.S. Dist. LEXIS 25981, **26-27 (S.D.N.Y. Mar. 31, 2008). Indeed, the Supreme Court in *Pembaur* noted that "a government frequently chooses a course of action tailored to a particular situation and not intended to control decisions in later situations," 475 U.S. at 481, and in *Turpin*, *supra*, this Court asserted that *Monell*'s "teachings are equally applicable to a specific policy directed at just one

---

at 202); *Owens*, *supra*, 601 F.2d at 1246 (a "single brutal incident" may be sufficient). This issue need not be resolved in the instant case.

87

individual, as long as the pleaded facts support the inference that unconstitutional action was taken against the individual pursuant to such policy." 619 F.2d at 202 n.7 (citation and internal quotation marks omitted).

That language from *Turpin* was the basis for a recent decision finding possible municipal liability in *Phat's Bar and Grill, LLC v. Louisville*, No. 3:10-CV-00491-JGH, 2013 U.S. Dist. LEXIS 9422, at *19 (W.D. Ky. Jan. 24, 2013), a case involving police harassment targeting a bar-restaurant, its owners, and its employees. The case is remarkably similar to the instant case except to the extent it involves fewer and less egregious incidents. There the court found a question for the jury of *Monell* liability for the "alleged established custom of harassing Phat's out of business." *Id.* at *20. Plaintiffs' burden was to "prove by circumstantial evidence that the course of conduct became a governmental custom, not merely an isolated event conducted by individual rogue officers." *Id.* That is precisely what jurors in the instant case should have been given the chance to consider rather than have the issue taken away from them. *Cf. Barry v. New York City Police Dep't*, No. 01 Civ.10627 (CBM), 2004 U.S. Dist. LEXIS 5951, at *40 (S.D.N.Y. Apr. 7, 2004) (police officer who "alleges to have suffered a wide range of retaliatory acts as opposed to one discrete instance of retaliation").

In such cases involving a custom or practice, plaintiff's evidence need not consider or even identify the responsible decisionmaker. *Kneipp, supra*, 95 F.3d at

1213. Determinations of deliberate indifference "need not rely on any particular factual showing," *Amnesty America*, *supra*, 361 F.3d at 128, and patterns of police misconduct can easily give rise to findings that more than one basis for municipal liability applies. *See Okin*, *supra*, 577 F.3d at 443 (finding genuine issues of material fact "on both theories of an unconstitutional custom and a failure to train"); *Blair*, *supra*, 223 F.3d at 1080-81 (evidence of retaliation sufficient to establish custom, deliberate indifference, and failure to train and/or discipline).

Based alone on the factors cited above, a question has been established for the jury of Nassau County's municipal liability. Given the egregiousness of police and fire marshal misconduct over the course of more than five years, which proceeded without any hint of correction, the jury could have found such liability on any number of theories, some overlapping—an unconstitutional custom or practice, deliberate indifference, failure to train, failure to supervise, or failure to discipline.

### C. The District Court Should Have Allowed the Jury to Consider the Role of Municipal Policymakers

The analysis does not end there, however, because this case does include evidence of involvement by municipal policymakers. The district court initially narrowed the scope of possible municipal liability to the acts and status of Fire Marshal Krummenacker and Officer Lowry. (A2177-A2178.) It then denied the jury any opportunity to consider such liability after concluding at trial they were

not policymakers[17] and that the actual policymaker, Deputy Chief O'Connor, perhaps working through Commanding Officer Studdert, merely "endeavor[ed] to help Mr. Chrebet" by "cut[ting] some slack to" him following Lowry's conversations with both officers. (A4384-A4394.) There is, incidentally, at least as strong an argument to be made that the commanding officer is himself the policymaker given his ultimate authority over the precinct (2354 at A2970, 2386 at A2978), but either way, O'Connor and Studdert had essentially the same conversation with Lowry.

The district court's interpretation of permissible inferences the jury could make regarding the role of these officers is visibly cramped. It has already been pointed out how implausible it is that such a protracted and egregious pattern of harassment could occur, with animus against Prince being imparted to new officer after new officer well after the events of 2002-2003, without the involvement or at least the knowledge of the precinct's commanding officer or supervising deputy chief (himself the former commanding officer). Indeed, "[w]here conduct of the supervisory authority is directly related to the denial of a constitutional right it is not to be distinguished, as a matter of causation, upon whether it was action or inaction." *Duchesne v. Sugarman*, 566 F.2d 817, 832 (2d Cir. 1977).

---

[17] *But see Panaderia La Diana, Inc. v. Salt Lake City Corp.*, 342 F. Supp.2d 1013, 1037-38 (D. Utah 2004) (finding a police lieutenant in charge of a narcotics operation to be the policymaker and resting municipal liability on the execution of a single search warrant he approved), *aff'd*, *Trevizo v. Adams*, 2006 U.S. App. LEXIS 18691 (10th Cir. July 26, 2006).

90

That the hallmarks of deliberate indifference and constructive notice have been reached is clear, but it is also well within the parameters of a reasonable jury to infer from the evidence actual notice, even actual involvement. Testimony reveals a retaliatory animus against Prince, and the logical follow-up when that animus is taken out on his place of business is to go easy on the employer after he does as he is told and fires Prince. Reasonable jurors can surely be permitted to infer more than that the policymaker was a mere "good cop" in a "good cop/bad cop" routine, unblemished with animus. To use another analogy, it can be inferred that one who is asked to turn a switch off was the one who either turned it on in the first place or had responsibility for allowing it to remain on.

The deployment of Margiotta by Chrebet, Jr., is also significant. As the Nassau County GOP chairman, Margiotta was a legendary figure "whose word was law." Richard Cummings, *The Pied Piper: Allard K. Lowenstein and the Liberal Dream* 383 (1985). Although retired as chairman, the testimony of Chrebet, Jr., and Suozzi reflects his role as a channel to those with the most influence during the critical period just before Prince's termination. Indeed, Suozzi found it "significant…that Mr. Margiotta asked me for a favor."

The conversations with Krummenacker and Lowry on June 27, 2007, are illustrative of the animus that existed at senior levels of the police and fire departments. While Krummenacker tries to pin mention of Prince on Margiotta,

91

who cannot testify because he is deceased, his testimony contradicts itself almost as often as it does that of Chrebet, Jr., who is clear Krummenacker told him he would stop having problems at his restaurant if he severed ties with Prince. Lowry's subsequent conversation that solidified Chrebet's decision to terminate Prince is similarly critical. Why did these men take this position if it was not a reflection of the will of the policymaker?

Lowry, whose testimony is also rife with contradictions, testified about his communication with Suozzi to set up his meeting with Chrebet, Jr., and Margiotta, and it is possible that he discussed Prince not only with O'Connor and Studdert, but also with Suozzi. It is telling that Suozzi was aware of Prince's termination— and with no other remark to supplement was he was told: that Chrebet, Jr., had "done the right thing" and "was going to do well now" by getting rid of Prince. Awareness of the top-ranking official in Nassau County only renders less plausible that Prince did not rise above the radar screen of low-ranking law enforcement officials. It bolsters the conclusion that Nassau County's liability stemmed from actual, not just constructive, notice and even the affirmative act of the policymaker.

Although the district court did not look at Inspector Capece's role, he qualifies as a policymaker since he was O'Connor's and Studdert's successor as commanding officer and similarly had ultimate responsibility for what occurs in the First Precinct. (2023 at A2884, 2354 at A2970, 2386 at A2978.) His role even

92

after Prince's termination is relevant in determining the policymaker's awareness and involvement, just as Rothenberg's post-termination instruction to Chrebet, Sr., to ban Prince from the premises served as a further illustration of municipal liability. Hermann's March 3, 2008, email to Capece proposing a multi-departmental raid on four establishments, of which Chrebet's was one, listed only one person's name: Prince. Why would he do so in that context if he did not have an understanding that the commanding officer knew that name and would understand it to be a trigger for the proposed raid? A proposal on which Capece summarily signed off with no questions: "10-4, good job." A reasonable jury has ample reason to infer the misconduct in this case surpassed willful blindness (sufficient though that would be to show municipal liability) and that it was not blind at all.

In sum, the evidence of misconduct is ample enough to support most grounds for municipal liability. Wherever the conduct of Nassau County officials falls on the spectrum of liability from constructive notice to actual notice to actual participation by policymakers, there can be no doubt that a reasonable jury could decide it fell within that spectrum.

## POINT II

## THE DISTRICT COURT ERRED IN DISMISSING PRINCE'S FIRST AMENDMENT RETALIATION CLAIM

In its decision partially granting summary judgment, the district court dismissed Prince's claim for First Amendment retaliation on the ground that Prince was required, but "failed to demonstrate that any action taken by defendants 'effectively chilled the exercise of his First Amendment rights.'" (A2155-A2161 (quoting *Williams v. Town of Greenburgh*, 535 F.3d 71, 76 (2d Cir. 2008).) This holding, which is reviewed *de novo*, *see Rubens*, *supra*, 527 F.3d at 254, is erroneous.

The district court based its holding on the fact that where a private citizen is suing for retaliation, "the Second Circuit has required the plaintiff to show '(1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right.'" *Kuck v. Danaher*, 600 F.3d 159, 168 (2d Cir. 2010) (quoting *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001)). Although there have been retaliation cases that impose those requirements in certain contexts, this select quote does not comprehensively reflect this Court's standard on the prerequisites for such a claim.

As this Court has explained, "different sorts of retaliation cases are susceptible to different requirements." *Gill v. Pidlypchak*, 389 F.3d 379 381 (2d

94

Cir. 2004). In some contexts involving private citizens suing public officials, "the only potential injury [the plaintiff] could have suffered was the impairment of his First Amendment rights." *Id.* at 382 (citations omitted). However, the Supreme Court "did not in any way rule out the possibility that the requisite harm might be of a non-speech sort." *Id.* at n.4 (citing *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972)). There is not "a subjective chill requirement where some other harm is asserted." *Id.* at 383 (citing *Gagliardi v. Village of Pawling,* 18 F.3d 188 (2d Cir.1994); *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals,* 282 F.3d 83 (2d Cir. 2002)).

Thus, the ability of a private citizen to assert a retaliation claim will not be defeated if concrete harm other than chilling can be demonstrated. *Kuck*, a private-citizen-versus-public-official case, is consistent with this broader understanding of the applicable standard. In the paragraph following the excerpt of that opinion cited by the district court, this Court cited *Gill* to explain the reason it was dismissing the claim: "retaliation cannot be established where *no adverse action* has been alleged." 600 F.3d at 168 (emphasis added and citations omitted). The following sentence noted, "Even more, nothing in the complaint suggests that Kuck's speech was 'actually chilled' as a result of the" conduct complained of. *Id.* This underscores that the actual requirement is adverse action, and courts tend to look for the chilling of speech in private citizen suits simply because that context

95

usually does not involve other adverse action.

In short, "chilling is a component required in cases where a plaintiff states

no harm independent of the chilling of speech," but "where retaliation is alleged to

have caused an injury separate from any chilling effect, (e.g., a job loss or

demotion), the 'chilling' element is not necessary to state a claim." *Bartels v. Inc.*

*Vill. of Lloyd*, 751 F. Supp.2d 387, 397 (E.D.N.Y. 2010) (citing *Gill*, *supra*;

*Morrison v. Johnson*, 429 F.3d 48, 51 (2d Cir. 2005)). *See also Vaher v. Town of*

*Orangetown*, 916 F. Supp.2d 404, 430-32 (S.D.N.Y. 2013); *Butler v. City of Glens*

*Falls*, No. 1:10-CV-679 (NAM/RFT), 2012 U.S. Dist. LEXIS 6826, *27

(N.D.N.Y. Jan. 20, 2012); *Tomlins v. Village of Wappinger Falls Zoning Board of*

*Appeals*, 812 F. Supp.2d 357, 371 n.17 (S.D.N.Y. 2011); *Puckett v. City of Glen*

*Cove*, 631 F. Supp.2d 226, 239-40 (E.D.N.Y. 2009). By holding otherwise, the

district court's dismissal of Prince's retaliation claim is an aberration from the law

of this Circuit.[18]

Of course, the instant case is one in which injury other than chilling is

clearly involved, thus satisfying the actual standard for retaliation. Some of that

harm is the same alleged by the private citizen plaintiff in *Vaher*, who suffered

"harm to his professional reputation, temporary modification of his job

---

[18] It is even an aberration from Judge Hurley's decision in *Roman Catholic Diocese v. Inc.*
*Village of Old Westbury*, No. 09-CV-5195, 2012 U.S. Dist. LEXIS 56694, **48-49 (E.D.N.Y.
Apr. 23, 2012), recognizing that other forms of harm are sufficient to sustain a retaliation claim
absent actual chilling.

responsibilities, further harassment and intimidation by Defendants and economic and pecuniary loss," 916 F. Supp.2d at 431-32, except of course that Prince was in fact terminated from his job.[19]  It may be an unusual circumstance for a suit by a private citizen to involve the specific harm of termination, but this simply illustrates the egregiousness of a case like this one, in which government officials tell a private employer to terminate someone on pain of continued harassment. Unusual as this situation may be, there can be no principled distinction between the retaliatory termination of a private citizen at the behest of government and that of a public employee.

Moreover, although Prince need not allege his speech was chilled for his retaliation claim to survive, the evidence nonetheless allows a jury to find that this was in fact among the injuries he suffered at the hands of Defendants.  From the start of the harassment when his parents owned Bogart's, Prince found himself not only silenced, but compelled to distance himself from the site by working several days per week outside Nassau County.  Under the next two owners, when he reached his employment agreements with the Dobins and with Chrebet, Jr., he was compelled to minimize any physical presence on the premises in his job description.  The erroneously precluded testimony of Chris Greene, *see* Point V *infra*, described the chilling effect of the police conduct on Prince and on his

---

[19] Retaliatory termination can occur years after the initial trigger for the retaliation.  *See Shanks*, *supra*, 653 F. Supp.2d at 168.

coworker.  When he attended the March 2005 meeting at Bogart's with the Dobins and fire marshals, Prince said not a word.  He hid upstairs in fear from the police and fire marshals during Chrebet's June 2007 grand opening.

A jury could also find his gratuitous, retaliatory arrest one week later "sufficient to constitute actual chilling of his First Amendment right to speak out against police officers."  *Anderson v. City of New York*, 817 F. Supp.2d 77, 97-98 (E.D.N.Y. 2011).  His 2008 banishment from the premises even after his termination completed the process of blackballing him from the restaurant and bar industry in Nassau County.  In short, when one considers all the retaliatory adverse action a jury can infer Prince suffered at the hands of Defendants, both non-chilling and chilling in nature, it is clear his First Amendment retaliation claim should not have been dismissed.


## POINT III

### THE DISTRICT COURT'S RESPONSE TO JURY QUESTIONS REGARDING THE INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS WAS INADEQUATE AND FAILED TO CURE CONFUSION OF A DEADLOCKED JURY

The jury's deadlock during their deliberations on the issue of intentional infliction of emotional distress was reflected in three notes to the district court. The court never gave them a response that, given the totality of the circumstances, can be said to have corrected the jury's confusion.  This issue is reviewable *de*

*novo*. *Hudson v. New York City*, 271 F.3d 62, 67 (2d Cir. 2001).

Objectionable jury instructions "must be considered as a whole," and "reversal is required where, 'based on a review of the record as a whole,…the error was prejudicial or the charge was highly confusing.'" *Id.* at 67-68, 70 (quoting *Termite Control Corp. v. Horowitz*, 28 F.3d 1335, 1345 (2d Cir. 1994)). "Repetitious instructions which place undue emphasis on matters favorable to either side constitute reversible error," *Gill v. Manuel*, 388 F.2d 799, 802 (9th Cir. 1973), as do instructions that are "not sufficiently balanced." *United States v. Dove*, 916 F.2d 41, 47 (2d Cir. 1990). The court "must be satisfied that, upon hearing the instructions, the jury understood the issues to be resolved and its duty to resolve them." *Townsend v. Lumbermans Mutual Casualty Co.*, 294 F.3d 1232, 1237 (10th Cir. 2002) (citation and internal quotation marks omitted). Reversal is required when there is "a substantial doubt that the jury has been fairly guided in its deliberations." *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 334 (5th Cir. 1997).

Additionally, a "charge that appears likely to have left the jury 'highly confused' may, on that ground alone, be reversed." *National Railroad Passenger Corp. v. One 25,900 Square Foot More or Less Parcel of Land*, 766 F.2d 685, 688 (2d Cir. 1985) (quoting *DeLima v. Trinidad Corp.*, 302 F.2d 585, 587 (2d Cir. 1962) (Marshall, J.)). "[W]hen a jury indicates through its queries that it is

99

confused as to important legal standards in a case, particularly where there is an apparent basis for the confusion, it is plain error for the district court not to clarify that confusion." *United States v. Duran*, 133 F.3d 1324, 1334 (10th Cir. 1998). A jury instruction given after deliberations have begun comes at a particularly delicate juncture and therefore evokes heightened scrutiny. *See Bollenbach v. United States*, 326 U.S. 607, 612 (1946); *Tart v. McGann*, 697 F.2d 75, 77 (2d Cir. 1982).

As this Court has indicated, when the "jury interrupts its deliberations to seek further explanation of the law," it has signaled that it has reached a "critical moment" in the trial. *United States v. Lefkowitz*, 284 F.2d 310, 314 (2d Cir. 1960). In this context, the Supreme Court held:

> Discharge of the jury's responsibility for drawing appropriate conclusions from the testimony depended on the discharge of the judge's responsibility to give the jury the required guidance by a lucid statement of the relevant legal criteria. When a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy. In any event,…the trial judge [has] no business to be 'quite cursory' in the circumstances in which the jury…asked for supplemental instruction.

*Bollenbach*, 326 U.S. at 612 (1946). *See also United States v. Rossomando*, 144 F.3d 197, 203 (2d Cir. 1998). "Upon receipt of questions from a deliberating jury, it is incumbent upon the district court to assume that at least some jurors are harboring confusion, which the original instructions either created or failed to clarify." *United States v. Combs*, 33 F.3d 667, 670 (6th Cir. 1994). *See also Price*

100

*v. Glosson Motor Lines, Inc.*, 509 F.2d 1033, 1036 (4th Cir. 1975) ("[T]he responsibility of the judge to the jury is particularly marked where the jury indicates its confusion on a specific subject.").

Additionally, "[w]hen a jury indicates confusion about an important legal issue, it is not sufficient for the court to rely on more general statements in its prior charge," *United States v. Nunez*, 889 F.2d 1564, 1568 (6th Cir. 1989), or make a "perfunctory re-reading of the very instructions which may have led to the difficulty." *Walsh v. Miehle-Goss-Dexter, Inc.*, 378 F.2d 409, 415 (3d Cir. 1967). The trial judge's responsibility in such cases is "to be responsive to the difficulty, and [the court] is required to give such supplemental instructions as may be necessary." *Johns v. Jarrard*, 927 F.3d 551, 554, (11th Cir.), *reh'g denied*, 935 F.2d 1297 (11th Cir. 1991) (citations and internal quotation marks omitted). The judge "must be meticulous in preparing supplemental instructions, taking pains adequately to explain the point that obviously is troubling the jury." *Combs*, 33 F.3d at 670.

In the instant case, the jury's initial note to the district court that it was "at an impasse regarding the elements of emotional distress" and seeking "clarification to help us….Please provide examples of outrageous & shocking" was followed by a second note, "*Third Cause of Action*," prior to the court's response. The jury's confusion on an important legal issue was clearly articulated. A responsive answer

was readily available in § 3:6 of the Pattern Jury Instructions, which simply collected New York case law. All the court did read, however, was what it admitted was "basically a restatement" of what the jury "have already been told with respect to this item"—the language from *Freihofer*, *supra*.

Virtually the same language, including citation to *Freihofer*, appears in § 3:6 of the Pattern Jury Instructions. Prince's counsel's request was simply to read what immediately followed, which offered the clarification the jury lacked and explicitly sought. The rejected language was entirely balanced and supported by numerous New York judicial decisions. Although in some cases, a court will understandably be reluctant to give supplemental instructions that more than restate prior instructions since the "judge's last word is apt to be the decisive word," *Bollenbach*, 326 U.S. at 612, what was clearly "decisive" in this case was the judge's failure to dispel confusion.

That is clear from the jurors' next note: "We are extremely deadlocked on the intentional infliction of emotional distress claim against all defendants." This should have sent a clear signal as to the necessity of the further instruction proposed by counsel or something similar. A deadlocked jury, after all, is the "classic example" of "manifest necessity" to declare a mistrial. *Downum v. United States*, 372 U.S. 734, 736 (1963); *United States v. Castellanos*, 478 F.2d 749, 751 (2d Cir. 1973).

102

In fact, the terms "extremely deadlocked" and "extreme deadlock" appear nowhere in reported federal or state case law.  *Bollenbach* involved a jury that used a similar phrase: "hopelessly deadlocked," a phrase employed after seven hours of deliberation.  *Id.* at 612.  In the instant case, the relevant note came more than a week into deliberations.  In *Bollenbach*, the Supreme Court described a "jury in a state of frayed nerves and fatigued attention, with the desire to go home and escape overnight detention, particularly in view of a plain hint from the judge that a verdict ought to be forthcoming."  326 U.S. at 612.  That is an apt description of the jury in the instant case, minus the overnight detention, but in the aftermath of a major natural disaster and the fear of losing the jury.  Although the judge remarked, "I feel badly for the jury for a number of reasons," which suggests awareness of a variety of factors that would foment jury confusion, his response deprived the jury of the law it sought to apply to the facts of the case.

The jury needed more than an *Allen* charge under the circumstances, *see* Point IV, *infra*, which at best pushed jurors into speculating as to the specific law that was readily available but denied to them.  That charge was followed by a jury request to be dismissed till Monday just over an hour later.   Given the brief deliberations that followed the "extremely deadlocked" jury, the *Allen* charge raises serious questions about the jury's verdict.[20]  *Cf. United States v.Zabriskie*,

---

[20] While timing generally is not a dispositive factor, the brevity of deliberations following

413 F.3d 1139, 1148 (10th Cir. 2005) (verdict reached same day despite "prior

persistent indications of intractable deadlock").

In all likelihood, this was a turning point in the jury's deliberations. The

rejected instructions were balanced and encompassed Prince's theory of the case.

Had the jury known that intentional infliction of emotional distress could be found

where there is "a deliberate and malicious campaign of harassment," there is a high

probability that would have changed their verdict. Under the circumstances, a new

trial should be ordered in light of the non-responsive instructions. *See Norwood v.*

*Vance*, 572 F.3d 626, 630 (9th Cir. 2009) ("[T]he court's failure to give additional

guidance…rendered the instruction incomplete and misleading"), *opinion amended*

*on other grounds on denial of reh'g*, 591 F.3d 1062 (9th Cir. 2010); *United States*

*v. Stevens*, 38 F.3d 167, 170 (5th Cir. 1994) (court's answer to jury questions not

"reasonably responsive"); *United States v. Zimmerman*, 943 F.2d 1204, 1214 (10th

Cir. 1991) (confused jury "needed help applying the instructions to the evidence");

*Dove*, *supra*, 916 F.2d at 47 (jury instructions "fail[ed] to balance the charge and

compass the theory of the defense"); *Walsh, supra*, 378 F.2d at 415 ("perfunctory"

instruction non-responsive).

---

persistent deadlock can be suggestive of coercion. *See United States v. United States Gypsum Co.*, 438 U.S. 422, 462 (1978); *People v. Aponte*, 2 N.Y.3d 304, 309 (2004).

## POINT IV

## THE DISTRICT COURT FAILED TO TAKE NECESSARY REMEDIAL ACTION IN THE FACE OF HURRICANE SANDY AND DELAYS PRIOR TO AND DURING JURY DELIBERATIONS

There was a thirteen-day gap between the close of evidence (October 24) and the start of jury deliberations (November 6) brought on primarily by the effects of Hurricane Sandy, plus an additional five-day gap that occurred early during jury deliberations, which recessed November 8 and reconvened November 13. Those delays followed a trial that kept jurors well beyond the length of time they were initially told would be required of them. The delays, the repeated statements by the district court posing concerns about the capacity of jurors to perform, and the unique impact of the storm make clear that the district court should have taken appropriate remedial action that was not in fact taken.

This issue appears to be one of first impression in this Circuit. Because it concerns trial management, it is reviewable for abuse of discretion. *United States v. Yakobowicz*, 427 F.3d 144, 149-50 (2d Cir. 2005). In general, there is "great discretion accorded to trial judges to manage their own courtrooms." *United States v. Esso*, 684 F.3d 347, 354 (2d Cir. 2012). In determining whether a court has abused its discretion, a number of factors should be considered, including "(1) the prejudice or surprise in fact to the opposing party; (2) the ability of the party to cure the prejudice;" and "(3) the extent of disruption of the orderly and efficient

105

trial of the case….” *Potthast v. Metro-North-North Railroad Co.*, 400 F.3d 143, 153 (2d Cir. 2005) (citation and internal quotation marks omitted).

As has long been held in the criminal context, jury separations—those periods of time in which jurors are separated from the court, evidence, and each other—carry due process considerations that counsel courts to approach them with caution. *See Carter v. United States*, 252 F.2d 608, 612 (D.C. Cir. 1957) (Prettyman, J.) (six-day mid-trial delay); *Hughes v. State*, 437 A.2d 559, 577 (Del. 1981). Of course, the longest jury separation in this case was not a matter of the district court's decision, but was compelled by a natural disaster. Hurricane Sandy was the most damaging storm to hit Long Island since 1938. *See* "After Sandy: Storm Sets New Marks," *Newsday*, Dec. 7, 2012, at A04.[21] Of the presence of the "surprise" factor there can be no question.

All parties had reason to fear their case could not be fairly considered by a jury that was unable to carry out its duty. The judge's own comments reflect this. The jury expressed concern about the length of the trial nearly seven weeks before its actual end, and the trial ran nearly three weeks later than what jurors were told would be the "worst case scenario." The judge repeatedly voiced fears of jury confusion even before the storm hit. After it did, and as reflected in the record, the jury faced additional burdens in connection with "gas lines, et cetera," problems

---

[21] This Court may take judicial notice of such sources for generally known facts pursuant to Fed. R. Evid. 201.

getting to court, another storm on the way, and the unsolved problem of "jurors [who] were carpooling and abandoned that process because of the absence of gas." Of course, hurricanes of the magnitude of Sandy cause any number of disruptions to the lives of residents.

Another major problem with delay is that jurors will tend to forget evidence, and the longer the delay, the more is forgotten. Indeed, this Court once held that a 4½-day "[a]djournment would have risked dulling the jurors' recollections of the evidence and summations and heightened the danger that the jurors would discuss the case with outside persons." *United States v. Stratton*, 779 F.2d 820, 832 (2d Cir. 1985), *cert. denied*, 476 U.S. 1162 (1986). Authoritative psychological texts confirm and explain this phenomenon: When jurors who have been presented with evidence then experience a long delay, new memories accumulated during the delay can be expected to prevent the jurors from remembering the earlier memories of the evidence. This phenomenon is known as "retroactive interference." *See* Richard C. Atkinson and Ernest R. Hilgard, *Introduction to Psychology* 288 (15th ed. 2009); Dennis Coon and John O. Mitterer, *Introduction to Psychology* 315 (11th ed. 2007). Highly stimulating activity is more likely to induce forgetting the earlier memories. *See* Dodge Fernald, *Psychology: Six Perspectives* 240 (2008). It follows that the impact of a major natural disaster would profoundly disrupt earlier memories. The complexity and the length of the instant case exacerbated this

107

problem as the trial spanned approximately 11 weeks, included 28 witnesses, and produced a transcript totaling approximately 5,075 pages.

Thus, after thirteen days away from the evidence, not to mention the later five-day separation, the jurors would be expected to recall the details of the storm rather than the evidence of the case—particularly one this complicated. This is not mere conjecture, but the clear inference from the seventeen read backs requested by the jury and the statements of the judge. One could not expect a much clearer acknowledgement of the unusual severity of the threat to due process than Judge Hurley's: "I feel so terrible for this jury. I never had a case where we had so many problems with read backs and I have been doing this for 30 years now. It's like endless."

A jury separation that "'involves such a probability that prejudice will result' that it must be deemed 'inherently lacking in due process'" warrants reversal. *United States v. Hay*, 122 F.3d 1233, 1236 (9th Cir. 1997) (forty-eight-day recess following the close of evidence an abuse of discretion) (quoting *Estes v. Texas*, 381 U.S. 532, 542-43 (1965)). As the Ninth Circuit held in *Hay*, this is so "regardless of [the] showing of actual prejudice." *Id.* (citing *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991)). *See also People v. Santamaria*, 229 Cal.App.3d 269, 278-80 (Cal. Ct. App. 1991) (reversal following eleven-day delay); *Adams v. State*, 765 S.W.2d 479, 480-81 (Tex. Ct. App. 1988, *pet. ref'd*) (reversal following eight-day

delay due to threatening icy weather); *Hayes v. State*, 292 P.2d 442, 449-51 (Okl. Cr. App. 1956) (reversal following two- and five-day delays). The Fourth Circuit, however, has upheld a mid-trial continuance of thirty-two days where the judge "took repeated steps to mitigate the potential for prejudice" and there was no showing of actual prejudice. *United States v. Smith*, 44 F.3d 1259, 1268 (4th Cir. 1995), *cert. denied*, 514 U.S. 1113 (1995).

Resolution of this issue does not require this Court to decide what length of delay rises to a *per se* abuse of discretion, because other factors demonstrate the strong probability of prejudice and the absence of remedial measures to mitigate prejudice. This is clear from the totality of the circumstances surrounding this case, including the effects of an arguably once-in-a-lifetime natural disaster for Long Islanders that hit the area and the numerous acknowledgments on the record of problems afflicting the jury, that together make clear the likelihood that prejudice would result and that "the extent of disruption of the orderly and efficient trial of the case" was extensive. Moreover, Prince should not be required to demonstrate further evidence of prejudice because the only way to do so conclusively would be to submit juror affidavits regarding the effects of the hurricane, the accompanying delays, and the overall length of the trial. Such affidavits would be inadmissible pursuant to Fed. R. Evid. 606(b). *Cf. Adams*, *supra*, 765 S.W.2d at 481 (juror affidavits in state proceeding insufficient to avoid

109

new trial where there was eight-day delay due to weather).

Looking at another factor cited in *Potthast*, one still may ask whether there was some way the district court could have cured the prejudice short of ordering a new trial.[22]  At a minimum, the court should have voir dired the jurors after their return to assess their capacity to discharge their duties, but because it did not, the extent of jury impairment following the storm cannot be determined.  *See Coppedge v. United States*, 272 F.2d 504, 507-08 (D.C. Cir. 1959) (court should have conducted voir dire after three-day separation), *cert. denied*, 368 U.S. 855 (1961).  Additionally, since summation by counsel for both sides waited until after the jury returned on November 5, there is a substantial risk the jurors relied on *argument* over *evidence*.  After a lengthy storm-driven delay, summation served less as an opportunity to summarize evidence to an educated jury than for counsel to place their entire case before a jury whose recollection of the evidence had faded.  Regardless of the volume of testimony that preceded it, the best closing argument was likely to win the verdict.

To avoid this problem and refresh the jurors' recollections, the district court could have summarized the evidence for the jury.  This occurred in *Ganapolsky v. Park Gardens Development Corp.*, 439 F.2d 844 (1st Cir. 1971), "in order to

---

[22] In his concurring opinion in *Krulewich v. United States*, 336 U.S. 440, 453 (1949), Justice Jackson wrote, "The naive assumption that prejudicial effects can be overcome by instructions to the jury…all practicing lawyers know to be unmitigated fiction."

refresh the memory of the jury, which had just returned from a four-day-weekend recess." *Id.* at 848. Indeed, "it is the right and duty of the court to aid them by recalling the testimony to their recollection, by collating its details, by suggesting grounds of preference where there is contradiction, by directing their attention to the most important facts, by eliminating the true points of inquiry, by resolving the evidence, however complicated, into its simplest elements, and by showing the bearing of its several parts and their combined effect, stripped of every consideration which might otherwise mislead or confuse them." *Nudd v. Burrows*, 91 U.S. (1 Otto) 426, 439 (1875).

Since no remedial measures were taken, there is not even a question of whether the district court chose the correct remedy. While the record reflects ample reason to doubt the jury's ability to perform its duties, it reflects no action by the district court to assess, let alone remedy, the underlying problem. Whether an assessment of the jury's capacity to carry out its duties, a summary of the evidence to the jury, or ordering a new trial would have been appropriate action to address the severe disruption of the trial, the failure to take any remedial action reinforces the conclusion that the case should be remanded for a new trial.

# POINT V

## CHRIS GREENE WAS IMPROPERLY PRECLUDED FROM OFFERING TESTIMONY AS TO HIS FEAR OF RETALIATION BY DEFENDANTS

The district court's preclusion of testimony is reviewed for abuse of discretion. *Zarega Avenue Realty Corp. v. Fred Todino & Sons, Inc.*, 571 F.3d 206, 212-13 (2d Cir. 2009). A court will overturn an evidentiary ruling that is "manifestly erroneous" unless the error is harmless. *Cameron v. City of New York*, 598 F.3d 50, 61 (2d Cir. 2010). Factors that determine whether a new trial is warranted include "whether the testimony bore on an issue that is plainly critical to the jury's decision" and "whether that testimony was material to the establishment of the critical fact or whether it was instead corroborated and cumulative." *Id.*

The district court erroneously precluded Chris Greene's testimony in response to questions he was asked as to why he did not report police misconduct to any law enforcement. His proffered response out of the presence of the jury detailed his fear of retaliation, including damage to his career, based on what he witnessed firsthand. It thus offered a basis for the most critical issues of this case: the pattern of retaliation that occurred at the hands of law enforcement and the economic damage that such retaliation caused Prince. *Cf. id.* at 65 (reversing where "the testimony bore on the two most important issues in the case"). The relevance of such testimony under Rule 403, the rule invoked for its preclusion, is manifest, as is the lack of offsetting prejudice carried by such testimony as to

112

Prince's core allegations.

Additionally, Greene's testimony "provided strong external validation," *id.* at 65-66, beyond Prince's own testimony for the causal relationship between harassment and Prince's injury. It underscored that Prince's fears and his perception of causation were objective and not just subjective in nature. No other witness worked with Prince over such an extended period of time, from his parents' ownership of the premises to its ownership by the Dobins and then Chrebet, Jr., and no one could as effectively attest to such damage besides Prince himself. That Prince's testimony could have external validation was key to his case, especially considering that Defendants used testimony from an expert witness to undermine Prince's credibility as marred by distortion or exaggeration. In fact, the jury's final questions for the district court prior to reaching its verdict requested read backs of testimony reflecting Prince's state of mind (A5108) and Prince's psychologist's testimony. (A5109.)

Under such circumstances, because "we cannot say with confidence" that the excluded testimony was harmless, it is necessary to "vacate the verdict and remand to the District Court for a new trial." *Cameron*, 598 F.3d at 66.[23]

---

[23] It merits a further note that Greene's testimony with respect to this and the risks associated with the landlord reporting to News 12 corroborate the chilling of speech that constitutes a component of Prince's erroneously dismissed First Amendment retaliation claim. *See* Point II *supra*.

## **<u>CONCLUSION</u>**

For the foregoing reasons, Plaintiff-Appellee Prince respectfully requests that this Court reverse the district court's judgment denying his claims for First Amendment retaliation and municipal liability under § 1983, reverse the verdict for Defendants-Appellees, and remand this case for a new trial.

Dated:      New Hyde Park, New York
             September 18, 2013

                          Respectfully Submitted,

                          /s/ Frank J. Scaturro
                          FisherBroyles, LLP
                          44 Carole Avenue
                          New Hyde Park, NY 11040-1964
                          (516) 640-4117
                          fscaturro@fisherbroyles.com
                          *Attorneys for Plaintiff-Appellant*

114

**Certification per Fed. R. App. P. 32(a)(7)(C)**

This is to certify that the foregoing brief complies with the 27,000 word

limitation requirement of this Court's order dated July 25, 2013, in that the brief is

calculated by the word processing program to contain 26,977 words,

exclusive of the Table of Contents and Table of Authorities.  This further

certifies that this brief complies with the type face requirement of Fed. R. App. P.

32(a)(b).


/s/ Frank J. Scaturro
Frank J. Scaturro
FisherBroyles, LLP
*Attorneys for Plaintiff-Appellant*

**SPECIAL APPENDIX**

**i**

## TABLE OF CONTENTS

**Page**

Judgment, dated November 20, 2012 ........................ SPA-1

SPA-1

AO 450 (Rev. 5/85) Judgment in a Civil Case

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------X
**MATTHEW PRINCE**                                       **CIVIL JUDGMENT**
                                                         **CV-08-1829 (DRH)**


    **-against-**


**COUNTY OF NASSAU; JOHN FITZGERALD,**
**LIEUTENANT NASSAU COUNTY POLICE**
**DEPARTMENT, FIRST PRECINCT; JOHN**
**SOTO, JOHN HERMANN, ARNOLD**
**ROTHENBERG, SERGEANTS, FIRST**
**PRECINCT; SCOTT TUSA, ASSOCIATE**
**FIRE MARSHAL**
----------------------------------------------------------X

  X    Jury Verdict: This action came before the Court for a trial by jury.  The issues have been tried and the jury has rendered  its verdict on NOVEMBER 20, 2012.

      Decision by the Court. This action came to trial or hearing  before  the Court. The issues have been tried or heard and a decision has been rendered.


      The case having been tried, and a jury having rendered a verdict for defendants , and the

Court having denied plaintiff's motion for judgment as a matter of law, or in the alternative,  for a

new trial,

      IT IS HEREBY ORDERED AND ADJUDGED  that  the Plaintiff, MATTHEW PRINCE

take  nothing from defendants,   COUNTY OF NASSAU; JOHN FITZGERALD, LIEUTENANT
NASSAU COUNTY  POLICE DEPARTMENT, FIRST PRECINCT; JOHN SOTO, JOHN
HERMANN, ARNOLD ROTHENBERG, SERGEANTS, FIRST PRECINCT; SCOTT TUSA,
ASSOCIATE FIRE MARSHAL

SPA-2

The case is closed with prejudice.


Dated:   NOVEMBER 20, 2012                    DOUGLAS C. PALMER
        Central Islip, New York                    CLERK OF THE COURT
                                  By: PATRICIA BEST
                                    Deputy Clerk